No. 32     May 26, 2016     559

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of J. C. N.-V.,
a Youth.
STATE OF OREGON,
*Respondent on Review,*

*v.*

J. C. N.-V.,
*Petitioner on Review.*
(CC J090600; CA A147958; SC S063111)

On review from the Court of Appeals.*

Argued and submitted November 9, 2015.

Angela Sherbo, Youth, Rights and Justice, Portland, argued the cause and filed the briefs for petitioner on review.

Erin K. Galli, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Jordan R. Silk, Schwabe, Williamson & Wyatt, P.C., Portland, filed the brief for *amici curiae* Megan E. Annito, Neelum Arya, Tamar R. Birckhead, Caroline Davidson, Barry C. Feld, Erik J. Girvan, Martin Guggenheim, Leslie Harris, Carrie S. Leonetti, Susan F. Mandiberg, Margie L. Paris, and Barbara Bennett Woodhouse.

Marsha Levick, Juvenile Law Center, Philadelphia, Pennsylvania, and Roy Pulvers, Holland & Knight LLP, Portland, filed the brief for *amici curiae* Juvenile Law Center, American Probation and Parole Association, The Barton Child Law and Policy Center, The Campaign for the Fair Sentencing of Youth, Campaign for Youth Justice, Center on Children and Families, Michele Deitch, Fight for Lifers West, Inc., Kristin Henning, Justice Policy Institute, Louisiana

_____
* On appeal from Washington County Circuit Court, James L. Fun, Jr., Judge. 268 Or App 505, 342 P3d 1046 (2015).

Center for Children's Rights, Mental Health America of Oregon, National Association of Criminal Defense Lawyers, national Center for Youth Law, National Juvenile Defender Center, National Juvenile Justice Network, Pacific Juvenile Defender Center, Rutgers-Camden School of Law Children's Justice Clinic, Sothern Poverty Law Center, Youth Law Center, Youth M.O.V.E. Oregon.

Sara F. Werboff, Portland, filed the brief for *amicus curiae* Oregon Justice Resource Center. With her on the brief were Lindsay Burrows and Elizabeth G. Daily.

Bronson D. James, Portland, filed the brief for *amici curiae* American Academy of Child and Adolescent Psychiatry and individual academics.

Before Balmer, Chief Justice, Kistler, Walters, Landau, Baldwin, and Brewer, Justices.**

WALTERS, J.

The judgment of the juvenile court and the decision of the Court of Appeals are reversed, and the case is remanded to the juvenile court for further consideration.

_____

** Linder, J., retired December 31, 2015, and did not participate in the decision of this case. Nakamoto, J., did not participate in the consideration or decision of this case.

**WALTERS, J.**

This case involves a challenge to a juvenile court's decision to waive its jurisdiction over a 13-year-old boy who was alleged to have committed aggravated murder. Under the relevant statutes, ORS 419C.352 and ORS 419C.349, a youth under the age of 15 who is alleged to have committed murder may be waived into adult court only if, at the time of the conduct, he or she "was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved." In this case, based on evidence suggesting that youth was of "average" sophistication and maturity for his age and was "just as effective" as peers of his age in understanding that his conduct was wrong, the juvenile court found that the statutory "sophistication and maturity" requirement had been satisfied. The Court of Appeals affirmed in an *en banc* decision, holding that the "sophistication and maturity" provision requires only an awareness of the physical nature and criminality of the conduct at issue—a test that generally has been considered sufficient to establish criminal capacity. *State v. J. C. N.-V.*, 268 Or App 505, 539, 342 P3d 1046 (2015). As discussed below, we agree with youth that the "sophistication and maturity" requirement is more demanding. Accordingly, we reverse the judgment of the Court of Appeals and the decision of the juvenile court, and remand the case to the juvenile court for further proceedings in accordance with this opinion.

## I. FACTUAL BACKGROUND

Youth was 13 years and eight months old when he allegedly participated in a violent murder and robbery. When he was taken into custody, youth was deemed to be within the exclusive jurisdiction of the juvenile court. ORS 419C.005(1); ORS 419C.094. The state, however, petitioned the juvenile court to waive youth into Washington County Circuit Court so that he could be tried as an adult for, among things, aggravated murder, ORS 163.095.

At a hearing on the state's petition, the parties presented evidence addressing the requirements for waiver. To show that youth possessed "sufficient sophistication and maturity to appreciate the nature and quality of the conduct

involved," ORS 419C.349(3), the state relied in large part on facts about youth's alleged participation in the murder. It presented evidence that Aguilar-Mandujano, the 20-year-old brother of youth's girlfriend, had solicited youth's assistance in a plan to rob and murder an adult acquaintance; that youth had agreed to participate; that youth had initiated the attack on the victim by striking him with a tire iron that Aguilar-Mandujano had provided; that youth had repeatedly hit the victim with the tire iron while Aguilar-Mandujano stabbed him with a knife; that Aguilar-Mandujano had given the knife to youth, who also had stabbed the victim in the chest and neck; that youth had assisted Aguilar-Mandujano in disposing of the murder weapons and in pushing the victim's body down to the river that ran next to the park where the murder occurred; and that youth had later returned to the river with another associate and, finding the victim's body still visible, had kicked the body completely into the river. The state suggested that the requisite "sophistication and maturity to appreciate the nature and quality of the conduct" was evident from youth's own admission that he had understood Aguilar-Mandujano's plan and what he was being asked to do, from his "high degree of participation" in the actual killing, from his efforts to conceal evidence of the murder, and from his own acknowledged apprehensions about being caught and going to jail for his participation in the murder.

The state also relied on an evaluation of youth submitted by a psychologist, Dr. Sebastian. Dr. Sebastian's report acknowledged youth's immaturity. She reported that, on a well-accepted "Sophistication-Maturity Scale" designed for use by courts in making waiver decisions, youth was immature in many ways: he "ha[d] not developed an internal locus of control," he was "influenced and led by older youth," and his "self-concept [was] not yet solidly developed." His "moral development [was] still immature in that he c[ould] identify the impacts of his behavior on his immediate family *** but he was unable to appreciate the impact of his behavior on his victims." Dr. Sebastian's conclusion, however, was that youth exhibited average sophistication and maturity for his age and that he understood that his conduct was wrong:

"By structured interview, testing and collateral dat[a], it is this examiner's opinion that [youth] is as sophisticated and mature as one might expect of a thirteen/fourteen-year old. In other words, he is average in sophistication and maturity for his age. Using records, testing and interview it is clear this young man has the ability to: (1) think independently, (2) understand behavioral norms and expectations of adolescents in the larger picture, (3) weigh the risks and benefits of his action, (4) demonstrate age appropriate social skills, (5) anticipate the consequences of his actions, [and] (6) discern which of his behaviors are antisocial. When compared to his age mates, he is just as effective or more effective (because of his strong cognitive ability) in understanding that his crime was wrong and identifying alternatives to his actions. He is less able than his peers at understanding his emotions, resolving conflicts effectively and resisting the influence of other youth."

To counter the state's contention that, at the time of the murder, youth had sufficient "sophistication and maturity to appreciate the nature and quality of [his] conduct," youth presented neuro-scientific evidence about the limitations of adolescent brains in relation to those of adults. An expert, Dr. Nagel, testified about the undeveloped nature of the prefrontal cortex in adolescents, and about how that neurological difference makes it harder for adolescents to access the brain's higher level, logical functions. Dr. Nagel also testified that not only do adolescents thus remain deficient in higher level thinking and decision-making, but the onset of puberty causes additional neurological "disequilibrium" by "turning up the volume" on the brain's emotional and reward centers. The result, Dr. Nagel testified, is that adolescents have significantly more trouble than both adults and younger children in making moral choices in emotionally-charged or social reward-based situations. Although adolescents may have the capacity to understand the act of killing someone in a cold situation, Dr. Nagel explained, that capacity is easily overridden in emotionally-laden situations.

Youth also presented the report of a psychologist, Dr. Bolstad, who had performed an intensive examination of youth and his history. Dr. Bolstad concluded that cognitively and in most other respects youth was "average" or "normal" for a 13-year-old. Dr. Bolstad noted, however, that

young adolescents as a whole are considerably less capable of independent thinking than are adults; they are "vulnerable to turning their own decision making responsibilities over to their peers or leaders in their peer group." Based on his review of youth's testing record, Dr. Bolstad opined that youth was even more strongly affected in that respect than most adolescents; he had "an immature orientation toward peer group associations, even in comparison with his own same-aged group."

Dr. Bolstad also noted that, because of their immature brains, 13-year-olds generally lack sophistication in terms of understanding abstract principles and have difficulty in weighing alternatives and in anticipating the consequences of their actions and decisions. Dr. Bolstad added that, because empathy and remorse require abstract thinking, 13-year-olds generally have limitations in those areas as well. He opined that much of the deficits in empathy and remorse that he and others had observed in youth was a product of his young age. He suggested, too, that a family culture of not talking about feelings and youth's own personal strategies for distracting himself from difficult feelings also might play a role in those deficits. When pressed to speak to the "sophistication and maturity" requirement of ORS 419C.349(3), Dr. Bolstad seemed to acknowledge that, at the time that youth participated in the murder, he could understand that what he was doing was against the law and that it potentially was going to harm someone; he opined, however, that, although youth thus could appreciate the nature of the crime at *some* level, he could not do so "at a level of having empathy because *** that's a much more challenging task for a 13-year-old with an immature brain." Dr. Bolstad concluded that the "cognitive deficits" associated with the typically undeveloped brain of adolescents "likely would have interfered with [youth's] capacity to appreciate the nature and quality of the conduct involved."

The parties also offered evidence on another requirement for waiver—that the juvenile court find that retaining jurisdiction over the youth would not serve "the best interests of the youth and of society," ORS 419C.349(4). That evidence addressed the considerations identified in

the statute—youth's amenability to treatment, the seriousness of the offense and the aggressive, violent, premeditated or willful manner in which it was committed, youth's history, including criminal history, the gravity of the injury caused by the offense, etc. The state's evidence included Dr. Sebastian's psychological evaluation, which suggested that youth was amenable to treatment; an analysis of treatment resources that suggested that similar resources were available in the juvenile and adult criminal systems up until the age of 25, but that only in the adult system would any sort of supervision or treatment extend beyond the age of 25; evidence of the willful and violent nature of youth's involvement in the murder; and evidence of youth's significant history of violent and delinquent acts, beginning as early as age nine. Youth's evidence focused primarily on youth's personal history and his amenability to treatment: Through Dr. Bolstad's testimony and the testimony of teachers, youth detention providers and the like, youth sought to demonstrate that he had performed well in the past in more controlled environments, that he was a normal 13-year-old in many ways, although even more susceptible to peer pressure than the typical youth of that age, and that, by the age of 25 when the juvenile court would no longer have jurisdiction, treatment and the simple maturation of his brain would transform him into a person who could be released without endangering the community.

After hearing the parties' evidence, the juvenile court granted the state's petition to waive youth into adult court. As required by ORS 419C.355, the court issued written findings in support of the required determinations under ORS 419C.349(3) and (4). Although the juvenile court's findings suggest some confusion about the significance of the determination required by ORS 419C.349(3),[1]

---

[1] In its introduction to the issues to be decided, the juvenile court stated:

"If at the time of the alleged offense Youth was older than age 12 and under the age of 15, the state must establish be a preponderance of the evidence that the best interest of the youth and society justify that Youth be prosecuted as an adult. *The foregoing consideration is informed by the youth's sophistication and maturity to appreciate the nature and quality of the conduct of the alleged offense* together with an evaluation of the amenability of youth to rehabilitation and treatment available to the juvenile court and the adult court. Specific consideration is given to the nature of the alleged crime, the

it nevertheless expressly made the required determination under that provision—that youth had sufficient "sophistication and maturity to appreciate the nature and quality of the conduct involved." The juvenile court based that determination on a number of factors. It particularly noted that youth had acknowledged to the police that he was aware of Aguilar-Mandujano's intentions before the actual murder, that his participation in the murder was purposeful and "intimate," and that he had acted purposefully after the murder to make detection of his participation more difficult. The court also observed that youth "was capable of understanding and appreciating his *Miranda* rights before his interview by the police, and sufficiently mature to participate in the police interview." Ultimately, the juvenile court concluded that youth's conduct

> "demonstrate[d] a degree of maturity consistent with Youth's biological age at the time of the event, and in several respects reflect[ed] a degree of maturity consistent with an older youth. Youth's response to the police in the interview was coherent and responsive. Youth was able to respond to questions of motivation and intent, explain his behavior, and the decisions behind his conduct. *** Youth was aware of the criminality of his conduct and told police he did not want to 'get in trouble' or 'go to jail.' Although Youth's decisions were tragically flawed, his statements to police demonstrate awareness regarding the nature of the criminal act, the degree of his participation in the criminal act, and an awareness of the consequences of the criminal act if apprehended by authorities."

In considering the issue of whether retention of the juvenile court's jurisdiction over youth was in the best interests of youth and of society, ORS 419C.349(4), the juvenile court paid considerable attention to youth's history of

_____

youth's prior history treatment and efforts, youth's prior record of behavior that would be crimes if committed by an adult, the violent and willful nature of the alleged acts, the physical, emotional and mental health of the youth, and the premeditated, willful nature of the alleged offense."

(Emphasis added.) As youth observes, that statement suggests that the juvenile court may have viewed the "sophistication and maturity" determination of ORS 419C.349(3) as one of many considerations going to the discretionary "best interest of the youth and of society" determination required by ORS 419C.349(4), rather than—as the legislature clearly intended it—a stand-alone requirement for waiver.

unlawful and sometimes violent conduct, beginning at the age of nine. It also contrasted youth's behavioral difficulties in public school with his exemplary behavior in the "structured and supportive environment" of juvenile detention facilities. Finally, the court considered whether youth's significant treatment needs, which youth's own expert had acknowledged, would be best met through juvenile or adult adjudication. It found that there would be no significant difference between the two adjudication paths until youth reached the age of 25, but that, at that point, the fact that only the adult adjudication system offered additional supervision made adult adjudication preferable. The court concluded that the interests of both youth and society would best be served by prosecution as an adult. Having thus made the determinations required under ORS 419C.349(3) and (4), the court entered a judgment and order waiving youth into adult court for prosecution on charges of Aggravated Murder, Robbery and Unlawful Use of a Weapon.[2]

Youth appealed the judgment and order of waiver,[3] primarily arguing that the juvenile court had misunderstood what the "sophistication and maturity" requirement of ORS 419C.349(3) entailed and, consequently, had incorrectly determined that that requirement was satisfied. Youth specifically argued that the legislature intended to impose a requirement that a youth have a "more adult-like" understanding of the conduct and its consequences than an average 13-year-old would possess.

In an *en banc* decision, the Court of Appeals rejected youth's interpretation of ORS 419C.349(3) along with youth's ultimate contention that the juvenile court's decision was in error. It opined that the legislature had drawn the provision's "nature and quality" wording from the common-law test for criminal capacity as it relates to the insanity

---

[2] Although the aggravated murder charge was the only charge against youth that was waivable under ORS 419C.352, the nonwaivable robbery and weapons charges were consolidated "for purposes of conducting the adjudicatory hearing" under ORS 419C.358.

[3] In the meantime, youth's criminal prosecution proceeded in Washington County Circuit Court. He was adjudged guilty of aggravated murder and other crimes and sentenced to life in prison with the possibility of parole after 30 years. The Court of Appeals has ordered that his appeal from that conviction and sentence be held in abeyance pending resolution of the present case.

defense, which has been held to require only that the person understand the physical nature and criminality of the act. *J. C. N.-V.*, 268 Or App at 518-20. It further opined that the legislature's purpose in employing the "sophistication and maturity" wording was only to exclude children who are *less* sophisticated and mature than their same-age peers, such as children who are "mentally retarded," "extremely emotionally disturbed," or "too immature to understand the nature of the act." *Id.* at 533. The Court of Appeals thus determined that ORS 419C.349(3) requires only that youths "understand what they are doing in a physical sense and understand that their actions are wrong or will likely have criminal consequences," *id.* at 539, a level of understanding that any normally-abled child of 12 to 14 years of age (or much younger) would possess and that, historically, was considered sufficient to establish criminal capacity. The Court of Appeals concluded that the juvenile court spoke to that requirement when it found that youth demonstrated "awareness regarding the nature of the criminal act, the degree of his participation in the act, and an awareness of the consequences of the criminal act if apprehended by authorities," and that evidence in the record supported those finding. *Id.* at 539-40. Consequently, the Court of Appeals affirmed.[4]

## II.   THE STATUTE AND THE PARTIES' ARGUMENTS

Youth is eligible for waiver under ORS 419C.352, which provides:

"The juvenile court, after a hearing, \*\*\* may waive a youth under 15 years of age at the time the act was committed to circuit court for prosecution as an adult if:

"(1)   The youth is represented by counsel during the waiver proceedings;

---

[4] The Court of Appeals opinion was not unanimous. In a dissenting opinion, Judge Egan, joined by Judge Ortega, took the position that the majority's reliance on the common law predecessor to the criminal insanity defense statute was inappropriate and that an interpretation based on the ordinary meaning of the statutory terms supported youth's view that ORS 419C.349(3) required an "individualized consideration of a youth's developmental capabilities—and not just a low-threshold inquiry of the youth's intellectual ability to 'know' or 'understand' that he or she committed a criminal act." 268 Or App at 555 (Egan, J., dissenting).

"(2)  *The juvenile court makes the findings required under ORS 419C.349(3) and (4)*; and

"(3)   The youth is alleged to have committed an act or acts that if committed by an adult would constitute one or more of the following crimes;

"(a)   Murder or any aggravated form thereof \*\*\*;

"(b)   Rape in the first degree \*\*\*;

"(c)   Sodomy in the first degree \*\*\*; or

"(d)   Unlawful sexual penetration in the first degree[.]"

(Emphasis added.) Subsection (2) of ORS 419C.352 refers to provisions from a different waiver statute, ORS 419C.349, that authorizes waiver of youths "15 years of age or older at the time of the commission of the alleged offense" who have committed any one of a number of specified criminal acts—but only if

"(3)  *The youth at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved*; and

"(4)   The juvenile court, after considering the following criteria,[5] determines by a preponderance of the evidence

---

[5] The criteria referenced in ORS 419C.349(4) are:

"(a) The amenability of the youth to treatment and rehabilitation given the techniques, facilities and personnel for rehabilitation available to the juvenile court and to the criminal court which would have jurisdiction after transfer;

"(b) The protection required by the community, given the seriousness of the offense alleged;

"(c) The aggressive, violent, premeditated or willful manner in which the offense was alleged to have been committed;

"(d) The previous history of the youth, including:

"(A) Prior treatment efforts and out-of-home placements; and

"(B) The physical, emotional and mental health of the youth;

"(e) The youth's prior record of acts which would be crimes if committed by an adult;

"(f) The gravity of the loss, damage or injury caused or attempted during the offense;

"(g) The prosecutive merit of the case against the youth; and

"(h) The desirability of disposing of all cases in one trial if there were adult co-offenders."

that retaining jurisdiction will not serve the best interests of the youth and of society and therefore is not justified."

Thus, the dispute in this case concerns the meaning of the italicized requirement set out in ORS 419C.349(3), as incorporated by reference in ORS 419C.352. As noted, ORS 419C.349(3) permits waiver of youths 15 years of age and older at the time of the commission of the offense. Although 419C.352 now permits waiver of younger juveniles, including those who, like youth, are 13 at the time of the commission of an offense, it is the meaning of ORS 419C.349(3) at the time of its enactment in 1985 that must be determined. [6]

The state contends that ORS 419C.349(3) requires that a youth have "enough knowledge of the world and enough of the qualities associated with a normal adult that the youth can understand what he physically did and that it was wrong." So understood, the state acknowledges, the requirement sets a low threshold, based on historical notions of criminal capacity, that only a few intellectually-challenged adolescents would be expected to fail. Generally, the state asserts, ORS 419C.349(3) is a rule of inclusion, and, therefore, youths of average abilities can be expected to meet the statutory standard.

Youth, on the other hand, argues that the provision sets a higher bar, permitting adult prosecution only of those juveniles who possess greater maturity and sophistication

---

[6] In 1994, voters adopted Measure 11, which required that youths 15 year of age or older who were charged with Measure 11 crimes be tried in adult court. In 1995, in response to Measure 11, the legislature amended the waiver statutes to permit waiver of youths under the age of 15 on the condition that (1) that the youth was represented by counsel during the waiver proceedings, (2) that the juvenile court made the findings specified in ORS 419C.349(3) and (4); and (3) that the youth was alleged to have committed an act that if committed by an adult would constitute one or more of four specified crimes, one of which was murder. Or Laws 1995, ch 422, § 78. Those provisions of the 1995 statute are codified at ORS 419C.352. The statute also lowered the age of criminal responsibility to 12, so that children under that age would not be exposed to the newly-adopted possibility of waiver for youths "under the age of 15." Or Laws 1995, ch 422, § 58. Thus, the 1995 statute made the requirement of ORS 419C.349(3) at issue in this case, that the "youth at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved" applicable to 12-, 13- and 14-year-old offenders who are charged with murder. However, as discussed later in this opinion, there is no evidence in the 1995 statute itself or its legislative history of an intent to alter the meaning given to ORS 419C.349(3) by the 1985 legislature.

than the average adolescent—an adult-like ability to appreciate the gravity and wrongfulness of their conduct and its consequences on a deeper intellectual and emotional level. And certainly, youth argues, the statute does not permit waiver of a youth who is only of "average" sophistication and maturity for his age. Such a youth may have the mental capacity to understand the physical nature of an act and its wrongfulness, but will not necessarily have sufficient adult-like capabilities to appreciate its consequences and wrongfulness in the ways that make adults culpable for their crimes.

## III.   LEGAL BACKGROUND

Before we analyze the parties' arguments, we think it helpful to describe the relevant legal framework in place at that time that the legislature enacted ORS 419C.349, along with the changes that the legislature made in that framework. That legal framework includes the common law and statutory standards for determining criminal capacity and the statutes defining the juvenile court's jurisdiction and governing the waiver of that jurisdiction.

### A.   *Criminal Capacity*

In 1985, when ORS 419C.349 was enacted, a youth could be considered lacking in criminal capacity either because the youth was too immature to be held criminally responsible or because the youth had a mental disease or defect that constituted a defense to criminal responsibility. The concepts are similar but their origins and the particular terms used to describe them are somewhat different.

#### 1.   *Immaturity*

At common law, the law used a child's age to assist in determining whether the child was too immature to have criminal capacity, distinguishing between children under and over the age of 14. Children under the age of 14 were presumed to lack criminal capacity that would justify holding them criminally responsible for their actions. For children under seven, that presumption was conclusive; for children between the ages of seven and 14, the presumption could be rebutted in individual cases. Wayne R. LaFave, 2 *Substantive Criminal Law* § 9.6(a) (2d ed 2003); *State v.*

*Nice*, 240 Or 343, 345, 401 P2d 296 (1965); *State v. Ewing*, 174 Or 487, 506, 149 P2d 765 (1944). For the latter class of children, a jury was required to decide whether the child was "in possession and exercise of sufficient mentality to make an intelligent choice and possessed a knowledge of right and wrong and of the wrongfulness of the act charged." LaFave, § 9.6(a). Once a child reached age 14, however, the child was "deemed to be criminally responsible." *State ex rel Juv. Dept. v. Reynolds*, 317 Or 560, 566, 857 P2d 560 (1993).

In 1971, the Oregon legislature codified the defense of immaturity, making the presumption of lack of criminal capacity conclusive for children who were under the age of 14 when the conduct occurred. ORS 161.380 (1971). The 1971 statute provided that a person being tried "in a court of criminal jurisdiction," *i.e.*, as an adult, was not "criminally responsible" for any conduct that occurred when the person was under 14 years of age.[7] Thus, at that time that ORS 419C.349 was enacted, youths who were 14 and older at the time that they committed an allegedly criminal act were not entitled to claim immaturity and were deemed criminally responsible for their conduct.

## 2. *Insanity*

At common law, the insanity defense was first described in an 1843 case, *M'Naghten's Case,* 10 Clark & Fin 200, 8 Eng Rep 718 (1843). The original *M'Naghten* rule, which early Oregon cases often quoted verbatim, set out a two-part test, one having to do with knowledge of the "nature and quality" of the act and the other having to do with the actor's knowledge of the act's wrongfulness:

> "If at the time of committing an act, the party was laboring under such a defect of reason from disease of the mind as not to *know the nature and quality of the act he was doing*, *or* if he did know the nature and quality thereof, that he did not know *that he was doing what was wrong,* he should not be held responsible under the criminal law."

*State v. Layton*, 174 Or 217, 226, 148 P2d 522, *cert den* 323 US 728 (1944) (emphasis added). *See also State v. Wallace*,

---

[7] That statute remained in effect until 1995, when the legislature amended it to lower the age of criminal responsibility to 12. Or Laws 1995, ch 422, § 58.

170 Or 60, 78, 131 P2d 222 (1942) (same); *State of Oregon v. Zorn*, 22 Or 591, 597, 30 P 317 (1892).

In 1971, the Oregon legislature adopted a statutory definition of insanity that negated criminal responsibility, and the common law rule and its "nature and quality of the act" wording fell out of usage in Oregon. The statutory formulation, which was imported from the Model Penal Code and which now is codified, as amended, at ORS 161.295(1), provides:

> "A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of the law."

B.   *Juvenile Court Jurisdiction and Waiver*

   1.   *Before 1985*

Prior to 1959, juveniles, *i.e.,* persons under 18 years of age, could be prosecuted in courts of criminal jurisdiction provided that they were of sufficient maturity to be criminally responsible. Beginning in 1907, however, juveniles also were subject to the jurisdiction of separate juvenile courts which emphasized rehabilitation rather than crime control. *Reynolds*, 317 Or at 567-68 (describing history). In 1959, the legislature gave those separate juvenile courts exclusive jurisdiction over juveniles and specified that adjudication by a juvenile court was not a criminal conviction. Or Laws 1959, ch 432, § 2, 36. Still, under the 1959 Juvenile Code, any juvenile 16 or older *at the time of a "remand" hearing* could be "remanded" to circuit court for prosecution as an adult on any criminal charge, based solely on a juvenile court's determination that retaining jurisdiction would not serve the child's best interests. *See* ORS 419.533 (1983) (providing for waiver of any youth 16 years old or older upon a finding by the juvenile court that retaining jurisdiction would not serve the best interests of the child).

As noted, in 1971, the legislature adopted ORS 161.380 (1971), providing that juveniles under age 14 at the time of an offense could not be held criminally responsible for the offense. That immaturity statute set a practical limit

on a juvenile court's "remand" authority. Even if a juvenile were 16 years old at the time of a remand hearing, the juvenile would have a defense to criminal prosecution for offenses committed when the juvenile was under the age of 14. And juveniles of any age could assert the defense of insanity. In fact, a juvenile was entitled to raise an insanity defense whether the juvenile was adjudicated in adult court or in juvenile court. *See State ex rel Juv. Dept v. L.J.*, 26 Or App 461, 464-65, 552 P2d 1322 (1976) (so holding).[8]

2.  *Legislative Changes in 1985*

In 1985, the legislature enacted the waiver provision at issue in this case. Or Laws 1985, ch 631, section 1. The 1985 statute, now codified as ORS 419C.349(3),[9] permitted the juvenile court to "waive" a youth[10] into adult court provided that the youth was 15 or older at the time an act was committed and that three additional conditions were met: (1) the youth was represented by counsel during the waiver proceedings, (2) the juvenile court made certain findings; and (3) the youth was alleged to have committed an act that if committed by an adult would constitute one or more of certain specified crimes. The two findings that the juvenile court was required to make were: (1) that "the youth at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved, ORS 419C.349(3); and (2) that, considering specified criteria, retaining jurisdiction in the juvenile court "will not serve the best interests of the youth and of society and therefore is not justified," ORS 419C.349(4).

---

[8]  The current juvenile code includes a provision that permits a juvenile court to find a juvenile responsible except for insanity if the court determines that the youth "as a result of mental disease or defect at the time the youth committed the act alleged in the petition, the youth lacked substantial capacity either to appreciate the nature and quality of the act or to conform the youth's conduct to the requirements of law." ORS 419C.411 (2). That provision was not a part of the juvenile code when ORS 419C.349(3) was enacted.

[9]  In 1985, the statute was codified as ORS 419.533(1)(c).

[10]  We generally use the term "waiver" in lieu of the term "remand." The term "remand" was used in the 1985 legislation.

We generally use the modern term "youth" to refer to a person under the age of 18. The terms "child" and "juvenile" have also been used for that purpose and the term "child" was used in the 1985 legislation.

Thus, under the 1985 statute, youths who were 14 at the time of an act remained immune from criminal prosecution. Youths who were 15 and older at the time of an act became subject to waiver, but they were afforded additional protections that had not been available before that legislation was passed. The 1985 legislation provided a new and more stringent standard for remand and new protections to youths who were waived into adult court. Or Laws 1985, ch 631, § 1. It also exempted youths who were tried as adults from the death penalty and from mandatory minimum sentences that otherwise might apply, and required that they be sent to separate juvenile facilities if convicted. Or Laws 1985, ch 631, §§ 7(3), 9.

## IV.  ANALYSIS

Having set out the foregoing background, we return to the issue at hand. To determine what the legislature intended when it enacted ORS 419C.349(3) in 1985, we examine the statutory text in its context, along with its legislative history. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009).

A.    *Text*

We begin with the statute's text, examining the ordinary meanings of its terms. In this case, the relevant text resolves naturally into three parts, which we analyze separately. The text requires that a youth have (1) "sufficient sophistication and maturity" to (2) "appreciate" the (3) "nature and quality of the conduct involved.'

The words in part one of the text describe adult-like qualities. The term "maturity," when viewed in isolation, describes a quality that is associated with normal, well-adjusted adults. *See Webster's Third New Int'l Dictionary* 1395 (unabridged ed 2002) (defining "maturity" as, among other things, "having and expressing the mental and emotional qualities that are considered normal to an adult socially adjusted human being"). "Sophistication" is similar, but carries with it a connotation of heightened worldliness and discernment.[11] "Sufficient" sophistication and maturity

---

[11] "Sophistication" is defined primarily by reference to the related adjective, "sophisticated." To be "sophisticated" is to be "deprived of native or original

refers to the amount of those qualities necessary to a particular situation or end[12]—in the case of ORS 419C.349(3), to "appreciate the nature and quality of the conduct involved."

Part two of the text requires that the youth have the ability to "appreciate" the nature and quality of the conduct at issue. The word "appreciate" ordinarily means to "comprehend [it] with knowledge, judgment and discrimination" or "to judge [it] with heightened perception or understanding." *Webster's* at 105.

Part three of the text describes the object of the youth's appreciation—the "nature and quality of the conduct involved." In ordinary parlance, both "nature" and "quality" refer to a thing's "essential character." *See Webster's* at 1507, 1858 (unabridged ed 2002) (defining "nature" as, among other things, "the essential character or constitution of something" and defining "quality" as "a peculiar and essential character"). In this instance, the "thing" is the conduct that constituted the alleged offense.

Based on the dictionary definitions of the words used in ORS 419C.349(3), the state argues that that provision requires that a youth have a level of understanding equivalent to the common law concept of criminal capacity. The state uses the term "criminal capacity" to mean a minimal level of understanding of limited aspects of a criminal act—a mental grasp of the physical nature of an act and its wrongfulness. Thus, taking an example from LaFave, the state uses the term criminal capacity to mean that a person knows that he or she is holding a flame to a building, that holding a flame to a building will make it burn, and that burning a building is wrong. LaFave, 1 *Substantive Criminal Law* § 7.2(b)(3). In making that argument, the state acknowledges that the words "maturity" and "sophistication" describe adult-like qualities. However, focusing on the qualifying word "sufficient," and the object of the understanding, the "nature and quality" of the conduct, the state

---

simplicity" or "worldly-wise, knowing." *Webster's Third New Int'l Dictionary* 2174 (unabridged ed 2002).

[12] "Sufficient" means to be "marked by quantity, scope, power or quality to meet with the demands, wants, or needs of a situation or of a proposed use or end." *Webster's* at 2284.

contends that the statute requires no more than an adult-like mental grasp of the physical nature of an act and its wrongfulness.

There are two problems with that interpretation of the statute's text. First, an ability to have a mental understanding of the physical nature of an act and its wrongfulness is not an ability that is particular to adults, as the defense of immaturity makes clear. At a very young age, a child can know that she is holding a flame to a building, that the flame will burn the building and that burning a building is wrong. In 1985, when ORS 419C.349 was enacted, Oregon law conclusively presumed that all children 14 and older would have criminal capacity. At common law, it was understood that many children seven years of age and older also would have that capability: The presumption of incapacity that attached to that age group could be, and often was, rebutted. Thus, it is seems unlikely that the legislature used the words "maturity" and "sophistication" to describe capabilities that all youths over age 14 and many children under age 14 were expected to have.

Second, the understanding necessary to establish criminal capacity—a mental grasp of the physical nature of an act and its criminality—is a basic awareness that would be better described by the word "know" than the word "appreciate." As noted, 359 Or at 577, the word "appreciate," describes an ability to comprehend with heightened understanding and judgment. The word "know" describes an awareness of a fact or concept.[13] The statute's use of the word "appreciate" rather than "know" is an indication that the legislature intended to require that a youth have a deeper ability to understand than a basic mental awareness.

Based solely on their ordinary meanings, the legislature's choice of the words "sophistication," "maturity," and "appreciate" suggests an intent to require an adult-like understanding of the nature and quality of an act that is beyond what ordinarily would be associated with criminal capacity.

---

[13] *Webster's,* at 1252, defines "knows" as "to have cognizance, consciousness of awareness of something: be aware of the existence or fact of something."

B.  *Context*

In interpreting a statute we also consider context. *Gaines*, 346 Or at 171. A statute's context includes other provisions of the same statute as well as the common law and statutory framework within which the statute was enacted. [*Denton and Denton*](), 326 Or 236, 241. 951 P2d 693 (1998). We already have described that framework to some extent. Both parties argue that that and other relevant context support their interpretation of ORS 419C.349(3).

1.  *The Insanity Defense*

The state argues that the statute's use of the words "nature and quality" is informed by the use of those terms in the insanity defense. As noted, 359 Or at 573, the insanity defense was first described in an 1843 case, *M'Naghten's Case,* 10 Clark & Fin 200. And, as also noted, *id.*, the original *M'Naghten* rule set out a two part test, one having to do with knowledge of the "nature and quality" of the act and the other having to do with the actor's knowledge of the act's wrongfulness:

> "If at the time of committing an act, the party was laboring under such a defect of reason from disease of the mind as not to *know the nature and quality of the act he was doing*, *or* if he did know the nature and quality thereof, that he did not know *that he was doing what was wrong,* he should not be held responsible under the criminal law."

The state argues that the statute's use of the words "nature and quality" is drawn from that test and thus indicates an intent to require a minimal showing of criminal capacity as the state explains that concept.

As an initial matter, we note that, although the phrase "nature and quality" was used in *M'Naghten* to refer narrowly to the nature of the act and its physical consequences, later cases and commentators suggested (in an era when psychiatry was expanding notions of mental incapacity) that the phrase was not so limited. For example, some suggested that the phrase "gives important emphasis to the realization of the wrongfulness of the act," Abraham S. Goldstein, *The Insanity Defense* 50-51 (1967); *State v. Esser*, 16 Wis 2d 567, 115 NW2d 505,521

(1962). Oregon's most recent expression of the rule, in *State v. Gilmore*, 242 Or 463, 468, 410 P2d 240 (1966), did just that, describing the defense in terms of a disease of the mind that "renders the person incapable of understanding the *nature and quality and consequences* of his act *or of distinguishing between right and wrong in relation to such act.*" (Emphasis added.) Because the classic, narrow reading of the *M'Naghten* test had been tempered by many courts and commentators by the time that ORS 419C.349(3) was enacted, it seems unlikely that legislature had that narrow and specific conception in mind, and the state does not disagree. The state acknowledges that the phrase, "nature and quality" of the conduct involved, refers to both a physical act and its wrongfulness. However, the state argues, the phrase also captures the necessary degree of understanding of those concepts—a mental ability to grasp them.

We agree that the words "nature and quality" may well have roots in the *M'Naghten* rule and that that context is helpful to understanding what we have denominated as part three of the statutory phrase—the object of the youth's appreciation. However, we are not persuaded that, when it enacted ORS 419C.349(3), the legislature intended to use that phrase to require only the limited understanding of an act and its consequences described in the *M'Naghten* rule. We think it significant that, although *M'Naghten* and other common law criminal capacity cases referred almost uniformly to a capacity to "know" the nature and wrongfulness of the conduct, the Oregon legislature, in enacting ORS 419C.349(3), chose a different word—"appreciate." At the time that ORS 419C.349 was enacted, jurists and lawmakers had for some time been taking note of how the choice to use one or the other of those words tended to affect the criminal capacity test. For example, Goldstein noted, in his 1967 treatise on the insanity defense, that the bulk of the critics read the word "know"

> "as referring to formal cognition or intellectual awareness alone. They distinguish this, the 'law's' meaning, from what they describe as the 'psychiatric' meaning—which they take to connote a fuller, deeper knowledge, involving emotional as well as intellectual awareness."

Goldstein, *The Insanity Defense* at 49. He observed that certain courts had chosen to state the rule in broader terms like "appreciate," on the theory that

> "the act must necessarily involve more than mere knowledge that the act is being committed; there must be an appreciation of the factors involved in the act and a mental capacity to measure and foresee the consequences of the violent conduct. In this view, the word 'appreciate' draws most psychosis under the *M'Naghten* rules, because it addresses itself to the defendant's awareness of the true significance of his conduct."

*Id.* at 50. And closer to home, the Oregon Criminal Law Revision Commission had written commentary to accompany ORS 161.295, the 1971 statutory revision of the common law insanity defense.[14] After explaining that the new statute was based on section 4.01(1) of the Model Penal Code, which in turn represented a modernized version of the *M'Naghten* rule, combined with the so-called "irresistible impulse" test, the commission noted that "the draft section substitutes 'appreciate' for *M'Naghten's* 'know,' thereby indicating a preference for the view that an offender must be emotionally as well as intellectually aware of the significance of his conduct." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 36 (July 1970). Particularly in light of the latter commentary, which was directed to the Oregon legislature, it seems reasonable to assume that, when the legislature later enacted a requirement that a juvenile "appreciate" the nature and quality of the conduct involved, it intended to require more than the minimal knowledge that was required to establish criminal capacity for purposes of the *M'Naghten* rule.

    2.    *The* Kent *Decision*

Youth argues that the words "sophistication and maturity" in ORS 419C.349(3) are informed by their use in a United States Supreme Court case, *Kent v. United States*, 383 US 541, 86 S Ct 1045, 16 L Ed 2d 84 (1966). In *Kent*, the United States Supreme Court was confronted

---

[14] The text of ORS 161.295 is set above, 359 Or at 574.

with a challenge to a juvenile court's somewhat perfunctory decision to waive its exclusive jurisdiction over a juvenile offender so that he could be tried criminally as an adult. The court held that the waiver decision implicated the juvenile's due process rights and that, to satisfy those rights, the juvenile court was required to conduct a full investigation. *Kent*, 383 US at 563-65. The court appended to its decision a set of criteria that juvenile courts in the District of Columbia had used in deciding waiver issues, hinting that due process would be served if juvenile courts based their waiver decisions on such criteria. Included in those criteria were items like the seriousness and violent nature of the offense, the juvenile's record and previous history, and, notably, *"[t]he sophistication and maturity* of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living." *Id.* at 566-67.[15] After *Kent*, courts and legislatures around the country adopted the so-called *Kent* criteria as providing a helpful,

---

[15] The criteria were set out in a policy memorandum, which the Court appended to its decision. They included:

"1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

"2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

"3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

"4. The prosecutive merit of the complaint, *i.e.,* whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

"5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U.S. District Court for the District of Columbia.

"6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

"7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court."

*Kent*, 383 US at 566-67.

and sometimes required, analytical framework for remand decisions. Office of Juvenile Justice and Delinquency Prevention, *Juvenile Justice Reform Initiatives in the States, 1994-96* 44 (October 1997); US General Accounting Office, *Juvenile Justice: Juveniles Processed in Criminal Court and Case Dispositions* 1, 13-14 (1995).

Youth observes, quite correctly, that the Oregon legislature borrowed from the *Kent* criteria when it adopted the waiver criteria set out at ORS 419C.349(3) and (4). The connection is evident from a cursory comparison of the criteria set out in ORS 419C.349(3) and (4) and the *Kent* criteria set out above, 359 Or at 575 n 8.[16] Accordingly, youth asserts, the "sophistication and maturity" wording of ORS 419C.349(3) must be read in the context of the waiver criteria set out in the appendix to *Kent*.

The "sophistication and maturity" criterion set out in *Kent* contemplated a fairly open and extensive examination of the mental, social and emotional development of the youth in question: The broad group of sources that it instructed courts to consider ("[the juvenile's] home, environmental situation, emotional attitude and pattern of living) are evidence of that. Moreover, in *Kent,* the "sophistication and maturity" criterion was free standing. It required a court to consider "the sophistication and maturity of the juvenile" as an independent criterion relevant to a waiver decision, indicating that the court should consider the full panoply of a youth's capabilities that indicate "maturity" and "sophistication." Based on the ordinary meaning of those terms, those capabilities would be the capabilities of normal adults that evidence heightened worldliness and

---

[16] In addition, the legislative history of the bill that eventually was enacted as ORS 419.349 shows that the bill's proponents repeatedly referred to the *Kent* criteria as a source for its waiver criteria, *see, e.g.,* Minutes, Senate Judiciary Committee, SB 414, April 25, 1985 (Judge Albin Norblad maintained that the sophistication and maturity criteria from *Kent* was absorbed into portion of bill that became ORS 419C.349(3)), and that the chief proponent, Senator Nancy Ryles, specifically alluded to sophistication and maturity as a test taken from the *Kent* decision, *see* Testimony, House Committee on Judiciary, Subcommittee 1, SB 414, May 30 1985, Ex. A-1 (statement of Senator Ryles). We provide this legislative history somewhat out of order in our analysis of ORS 419C.349(3) only to establish that *Kent* and its waiver criteria are important context for understanding what the legislature intended by the provision's "sophistication and maturity" wording.

discernment. Because those terms were used to deter-mine, among other things, whether a youth was sufficiently blameworthy to stand trial as an adult,[17] it seems logical that they would include adult-like traits that relate to tra-ditional notions of blameworthiness beyond those necessary to establish criminal responsibility, such as capacities for premeditation and planning, impulse control, independent judgment, and a more hardened personality and outlook. Given our understanding that the statutory phrase "sophis-tication and maturity" came from the *Kent* criteria, it is log-ical to understand the phrase as requiring an inquiry into the extent to which a juvenile's mental, social and emotional developmental capabilities indicate adult-like capabilities indicative of blameworthiness.

        As we have indicated, however, under ORS 419.349(3), a trial court does not consider a youth's sophis-tication and maturity in isolation. That statute requires a court to consider a youth's sophistication and maturity "to appreciate the nature and quality of the conduct involved." The issue under ORS 419C.349(3) is not the youth's *general* sophistication and maturity as it relates the waiver decision (as it is under the *Kent* criterion), but the *particular* aspects of "sophistication and maturity" that are involved in "appre-ciat[ing] the nature and quality" of one's own criminal

---

[17] One student of the issue has observed that juvenile courts use the concepts of sophistication and maturity in a number of ways when making remand deci-sions, leading to a conclusion that courts are interested in

"whether youth have been committing crimes 'like adults' or whether youth's crimes have occurred in the context of immature impulsiveness and without adult capacities to weigh the consequences before they acted. The implication is that youth who are less mature, and therefore less capable of understand-ing the implications of their actions and regulating their behavior, are less appropriate subjects for criminal adjudication.

"Commentators have proposed that courts may see very immature youth as less appropriate subjects for criminal court for two reasons. They may be perceived as *less blameworthy* because of their immaturity, so that the more severe sentences associated with criminal prosecution are less appropriate. Less mature youth might also be perceived as *less competent* to participate in criminal proceedings. That is, their immature cognitive and emotional char-acteristics raise doubt about their capacities to participate in their trials in a manner that satisfies due process regarding the competence of defendants to stand trial."

Thomas Grasso, *Clinicians' Transfer Evaluations: How Well Can They Assist Judicial Discretion?*, 71 La L Rev 157 (2010) (emphasis in original).

conduct. In so narrowing the inquiry, however, the Oregon legislature did not evidence an intent to remove the issue of the youth's sophistication and maturity from the analysis altogether, or to narrow the means by which sophistication and maturity are to be ascertained. To the contrary, the very fact that the legislature chose to reference a youth's sophistication and maturity, as opposed to using terms used in other legal contexts, such as "capacity," suggests a commitment to the kind of inquiry contemplated by the *Kent* criterion. It also suggests an intent not only to require that a youth have some ability to "appreciate" the nature and quality of the youth's conduct, but that the youth do so with some level of "sophistication and maturity"—traits that are associated with normal adults, *see above,* 359 Or at 576, and that, in the *Kent* context, would justify adjudication as an adult. Thus, the inclusion of the phrase "sophistication and maturity" in ORS 419C.239(3) suggests that the legislature intended that a court look for indicia of adult-like mental, social and emotional development as it relates to a youth's ability to "appreciate of the nature and quality of the conduct involved."

### 3.   *Other common law and statutory context*

Youth also directs our attention to notions of the capacities of juveniles reflected in the law as it stood when ORS 419C.349(3) was enacted, and the logic of ORS 419C.349(3) in that context. In 1985, there was a broad understanding among jurists and lawmakers that, because youths are mentally, socially and emotionally less formed, they are inherently less capable of making critical decisions and require society's protection. The case law of the time is replete with statements to that effect. *See, e.g., Eddings v. Oklahoma*, 455 US 104, 115-16, 102 S Ct 869, 71 L Ed 2d 1 (1982) ("Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults"); *Bellotti v. Baird*, 443 US 622, 634, 99 S Ct 3035, 61 L Ed 2d 797 (1979) (limitations on rights and privileges of juveniles stem from their peculiar vulnerability, their inability to make critical decisions in an informed, mature manner, and the importance of the parental role). A plethora of statutes placing age restrictions on the exercise of important privileges,

in Oregon and elsewhere, also reflected that thinking. *See, e.g.*, ORS 482.110 (1983) (driving); ORS 109.640 (medical decisions) (1983); ORS 109.670 (1983) (donating blood); ORS 106.060 (1983) (marriage); ORS 247.002(2) (1983) (voting); ORS 471.430 (purchase of alcohol). And it is evident that those general sentiments about the lesser capacity of juveniles extended to their moral development and their capacity to be criminally culpable. *See, e.g.*, Andrew Walkover, *The Infancy Defense in the New Juvenile Court*, 31 UCLA L Rev 503, 538-47 (1984) (discussing research and analysis of moral development, based in the work of traditional theorists like Jean Piaget and B.F. Skinner, as an avenue for exploring the idea that a child's capacity to make moral judgments is substantially inferior to that of an adult).

In fact, the idea that children are morally undeveloped and, therefore, less criminally culpable, has long been a feature of Oregon law. As noted, at the time that ORS 419C.349(3) was enacted, Oregon law provided that juveniles under age 14 at the time of their conduct could not be held criminally responsible for that conduct. ORS 161.380 (1983). But even juveniles aged 14 and older who were deemed criminally responsible for their conduct generally were not criminally prosecuted for that conduct. Instead, they were held responsible for their conduct in juvenile court, where the law emphasized rehabilitation rather than crime control. *Reynolds*, 317 Or at 569-71. Juveniles aged 16 and older could be "remanded" to adult court, but the age of remand—16 at the time of the remand hearing—was independent of the age of criminal capacity—14 at the age of the offense—and dependent only on the best interests of the child. ORS 419.533 (1983).

In 1985, with the enactment of the statute at issue here, the legislature lowered the age at which youths could be waived into adult court to 15 (at the time of the offense). The drafters had originally proposed to lower that age to 14. SB 414 (1985)**.** That proposed change would have made the age that a youth was subject to waiver the same as the age at which a youth was deemed to be criminally responsible—age 14. ORS 161.380; *Reynolds*, 317 Or at 566. However, the legislature rejected that proposal and permitted a juvenile court to waive its jurisdiction only for youth

age 15 and older. Although it is possible that the legislature both *deemed* 15-year-olds to be criminally responsible under ORS 161.380 and adopted ORS 419C.349(3) to require a *showing* that a 15-year-old had criminal capacity, it seems unlikely as a matter of logic. And certainly, the legislature did not use words that evidence that intent. As discussed, the words "sophistication" and "maturity" refer to capabilities associated with adults, not to capabilities that the law expects every 15-year-old to have.

Significantly, although the law treats all youths 14 and older as being criminally responsible, it assumes that those under 18 generally will be held responsible for their conduct in juvenile, rather than adult, court. Under ORS 419C.005, the juvenile court has exclusive original jurisdiction in any case involving a person under 18 years of age who has committed an act that, if done by an adult, would constitute a crime. ORS 419C.349, allows some youths under 18 to be waived into adult court, but only two things distinguish a 15- to 17-year-old youth who is eligible for adult adjudication from one who is not: the type of crime with which the youth is charged, ORS 419C.349(2), and the youth's possession, under ORS 419C.349(3), of "sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved." Given that fact, it is logical to assume that that threshold "sophistication and maturity" requirement demands an ability to appreciate the nature and quality of the conduct involved that is different from the criminal capacity that all 15- to 17-year-olds already are deemed to have.

The state, however, draws a different conclusion from that statutory framework. The state suggests that it is significant that the same "sufficient sophistication and maturity" requirement applies to 13-year-olds under ORS 419C.352(2) and 17-year-olds under ORS 419C.349(3). The state argues that that equal applicability shows that the legislature intended the "sufficient sophistication and maturity" requirement as a straightforward individualized determination of a youth's mental capacity to understand what he or she was doing and that it was wrong, and not as a determination of the youth's capacity in comparison to other youths. But the comparison for which youth contends, and

that the "sufficient sophistication and maturity" wording seems to convey, is not a comparison to other youths. It is a comparison with the capabilities of a normal adult. We certainly would expect a 17-year-old to more easily pass muster under such a comparison than would a 13-year-old, but that is, perhaps, as it should be. The bottom line is that there is nothing in the fact that the same test applies regardless of the youth's age that compels a conclusion that the requirement is a minimal one that most youths would be expected to meet.

C.   *Text and context combined*

The upshot of the foregoing discussion of text and context is that ORS 419C.349(3) represents a combination of terms and phrases, which, when given both their ordinary and specialized meanings and considered together, convey a requirement for waiver that is more demanding than the one that the state proposes. If, as the state argues, the legislature intended to require only that the youth know what he or she is doing in a physical sense and that it is wrong, then it could have expressed that intent in the terms of the classic *M'Naghten* rule. And even if we agree that the legislature took the phrase "nature and quality" from that rule, it is obvious that the legislature chose to combine a piece of that rule with other terms and phrases that require a deeper and more "matur[e]" and "sophisticat[ed]" understanding than a typical youth would have. To give meaning to each of those terms and phrases, as we must, ORS 174.010, we interpret the text of ORS 419C.349(3) to require that a youth have sufficient adult-like intellectual and emotional capabilities to appreciate the nature and wrongfulness of the conduct to justify his or her prosecution as an adult.

The statutory context, including other provisions of the waiver statute and the common law and statutory context in which ORS 419C.349 was enacted, support that construction. As discussed, the meaning that jurists attached to the word "appreciate" in discussions of the *M'Naghten* insanity standard likely informed the legislature's choice of that word in ORS 419C.349(3), and suggests that it intended to require a deeper intellectual and emotional understanding of the nature, consequences and wrongfulness of the conduct

than mere criminal capacity would require. Similarly, evidence that the legislature drew the phrase "sophistication and maturity" in ORS 419C.239(3) from the *Kent* case suggests that it intended juvenile courts to look for indicia of adult-like mental, social and emotional development indicative of blameworthiness as it relates to a youth's ability to "appreciate of the nature and quality of the conduct involved." And the common law and statutory milieu at the time that ORS 419.349 was enacted suggests that the legislature approached the legislative process with an understanding that youths who are 15 and older generally have criminal capacity, but generally lack adult-like intellectual and emotional capabilities that would justify their exposure to criminal prosecution and punishment.

Thus, it is not difficult for us to conclude that the legislature did not intend to make waiver of juvenile court jurisdiction turn on a youth's criminal capacity. What the legislature did intend is more difficult. Although it seems that the legislature intended to require that a juvenile court make a finding that a youth have adult-like intellectual and emotional capabilities indicative of blameworthiness, it did not set out with any specificity the standard that a court should use to decide what those capabilities entail and whether a youth has a "sufficient" modicum of those capabilities. It is likely that the adult-like capabilities with which the legislature was concerned were the capabilities that a typical adult would have and that a court would consider in deciding whether a youth is sufficiently blameworthy that adult prosecution is warranted, such as capacities for premeditation and planning, impulse control, and independent judgment. However, the legislature did not specifically describe those capabilities and the words that the legislature used do not permit us to decide, as a matter of law, the capabilities that distinguish a typical adult from a typical youth. As a result, based on its text and context, we interpret ORS 419C.349(3) to permit a juvenile court to determine, as a matter of fact, what those capabilities are and whether a particular youth possesses them to a sufficient extent that the court can conclude that the youth can "appreciate the nature and quality of the conduct involved," including its consequences and wrongfulness.

D.  *Legislative History*

1.  *1985 Legislative History*

Finally, we examine the provision's legislative history for evidence that supports or undermines that tentative conclusion. As discussed above, 359 Or at 576, ORS 419C.349(3) is part of a 1985 statute that both lowered the age when a juvenile might be waived into adult court and adopted more stringent standards for all waivers. When the legislature considered the underlying bill, SB 414 (1985), it did not discuss the specific wording of ORS 419C.349(3) that is at issue here in a way that is helpful.[18] However, some more general comments by proponents of the bill are suggestive. For example, Senator Nancy Ryles, who introduced the bill, described the bill's intent as providing a waiver option "for those *more mature* 14- and 15-year-olds so that those who commit a violent crime will not be prematurely released back into society." Testimony, Senate Judiciary Committee, SB 414, Apr 25, 1985, Ex B (statement of Senator Ryles). And other testimony in support of the bill in the 1985 legislature reiterated the theme that the bill was directed at particularly mature 14- and 15- year-olds. Keith Meisenheimer of the Multnomah County District Attorney's office testified that

> "when we retain within the juvenile system individuals whose characteristics and attitudes *are more adult than juvenile, who are hardened and immune to programs designed to meet youthful needs*, we not only fail to treat those individuals appropriately, but we undermine the program for the youths who are appropriate for it."

Testimony, Senate Judiciary Committee, SB 414, Apr 25, 1985, Ex G (statement of Keith Meisenheimer). Meisenheimer also testified that

---

[18] With regard to the "sufficient sophistication and maturity" wording, Senator Nancy Ryles did, at one point, attempt to explain: "So you're really saying yes, the person knew what they did, they knew the consequences of what they did, and they were of sufficient maturity to understand that at the time." Audio Recording, House Committee on Judiciary, Subcommittee 1, SB 414, May 30, 1985, Tape 692 (statement of Senator Ryles). That statement, however, does not advance our inquiry because it does not discuss what is necessary to establish "sufficient maturity."

"by reason of *advanced maturity*, sociopathic character, past record of failure in juvenile court programs, established history of criminal conduct, large size, independence of parental or other adult authority or influence, etc. are dangerous to the community and not amenable to significant rehabilitation in juvenile programs."

*Id.*

Those comments are contrary to the state's view that the statute only excludes exceptionally immature youths who do not have the mental capacity to understand their conduct and its criminality from the possibility of waiver. They suggest that the legislature intended to require that, to obtain waiver, the state establish that a youth have adult-like capabilities different than those of other youths, who, at age 14, are deemed to have criminal capacity.

We also note that, although the legislature was considering a bill that was directed in part at lowering the age when a youth could be waived into adult court, it continued to be deeply concerned with protecting youth offenders, whom legislators saw as being amenable to rehabilitation and in need of protection. In that respect, it is significant that the bill, for the first time, imposed specific legal requirements as a prerequisite to waiver. Legislators were made aware that, prior to the bill's enactment, Oregon had one of the highest rates of remand to adult court in the country, as well as a highly inconsistent use of the procedure, largely due to the fact that the existing remand statute provided no standards for remand other than that the juvenile court find that retaining jurisdiction was not in the best interests of the child. By limiting the juvenile court's authority to remand to specified, more serious offenses, and by providing specific criteria to be considered by the juvenile court when evaluating the remand option, the proponents of SB 414 believed that they would eliminate such "abuses" of the remand option. Testimony, Senate Judiciary Committee, SB 414, Apr 25, 1985, Ex B (statement of Senator Ryles).

The discussions surrounding the adoption of the waiver criteria show that the legislature believed that juveniles generally should be adjudicated in the more treatment-oriented juvenile system and that adult

prosecution should be limited to individuals whose culpability made adjudication in the juvenile justice system inappropriate. *See, e.g.*, Audio Recording, Senate Judiciary Committee, SB 414, Apr 25, 1995, Tape 109, Side B (comment of Judge Albin Norblad, co-drafter of SB 414, that it should be more difficult to remand juveniles but that some, few, exceptionally dangerous juveniles should be remanded for society's protection); Audio Recording, Senate Judiciary Committee, SB 414, May 7, 1985, Tape 123, Side A (comment of Committee Chairman William Frye that, while 14-year-olds are not proper subjects for adult prosecution and incarceration, laws are needed that cover the rare dangerous juvenile criminal). In the eyes of the bill's proponents, one of the significant things that made juvenile jurisdiction inappropriate was the fact that, if left in the juvenile system, such hardened and dangerous individuals might victimize other juveniles who also are in the juvenile justice system. Audio Recording, House Committee on the Judiciary, Subcommittee 1, SB 414, May 30, 1985, Tape 693 (comment of Multnomah County District Attorney Keith Meisenheimer that when more sophisticated and hardened individuals are retained in juvenile system, they undermine purpose of having a separate system for juveniles by victimizing other juveniles).

While not wholly incompatible with the interpretation of ORS 419C.349(3) for which the state contends, the generally protective attitude reflected in the foregoing legislative history is more consistent with the idea that juveniles who are cognitively and emotionally average should be adjudicated within the more protective juvenile justice system. In that respect, the legislative history of ORS 419C.349(3) adds some support to the idea that the provision demands an adult-like rather than child-like understanding of the nature, consequences and wrongfulness of a youth's conduct.

The parties' other arguments about the 1985 legislative history are, however, unpersuasive. The state finds significance in the fact that, during consideration of the bill, the ACLU suggested that criminal responsibility sufficient to justify remand should include not only "a capacity to distinguish right from wrong [but also] an ability to conform one's actions to that understanding." Testimony, House

Judiciary Committee, Subcommittee 1, SB 414, May 30, 1985, Ex D (statement of Claudia Burton, ACLU). The state argues that the fact that the legislature did not act on those comments establishes an affirmative intent *not* to include consideration of youthful impulsivity in the waiver analysis. Given that the comments were not attached to a proposed amendment, we are reluctant to say that the legislature's "failure to act" has any significance. But, in any event, youth has not made a focused argument to this court that, in addition to or as an aspect of requiring "sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved," ORS 419C.349(3) requires an ability to conform one's actions to the requirements of the law. As such, the legislature's inaction in the face of the noted comments by the ACLU is not relevant to any issue before the court.

Youth's primary appeal to SB 414's legislative history is similarly unpersuasive. It focuses on the fact that proponents of the bill repeatedly stated that, if the bill were enacted, only a few 14- to 15-year-olds would be eligible for waiver each year. In youth's view, the necessary premise underpinning those statements must have been that the bill set an extremely high threshold for remand—a level of maturity and sophistication that very few 14- and 15-year-olds could possess. However, when the cited statements are read in the context in which they were made, it is clear that the speakers were not referring to the stringency of the "sophistication and maturity" requirement but to the fact that very few 14- and 15-year-olds were committing the kinds of crimes that would trigger eligibility for waiver under the bill. The statements, therefore, add nothing to our present analysis.

### 2. *1995 and 1983 Legislative History*

The legislative history associated with two other bills is also potentially relevant here. First, it is important to acknowledge that the waiver statute that applies directly to youth in this case and that incorporates by reference the requirement at ORS 419C.349(3) was enacted in 1995. It was in 1985 that the legislature enacted ORS 419C.349—the statute that lowered the age when waiver to adult court

was permitted to 15 and set out the standard for waiver that is now under consideration. It was in 1995, however, that the legislature enacted ORS 419.352, the statute that permitted waiver of youths *under* the age of 15, including the youth who is the subject of this proceeding. Although it is therefore appropriate that we consider the legislative history of the 1995 statute that incorporates by reference the waiver standard that we interpret here, the parties do not point to anything in that legislative history that suggests that the legislature had any particular understanding of ORS 419C.349(3) when it acted. We also are not aware of any aspect of the 1995 legislative history that might speak to the meaning of the earlier provision.

The state does rely, however, on the legislative history for another bill—HB 2955 (1983)—which was passed by the House in the 1983 legislative session but which ultimately died in the Senate. SB 414 (1985) was introduced in the 1985 legislature as identical to the engrossed version of the bill that had failed in the prior session. Testimony, Senate Judiciary Committee, SB 414, Apr 25, 1985, Ex B (statement of Senator Ryles). The state argues that, because the substance of the 1983 bill is the same as the 1985 bill that actually was enacted, the legislative history of the earlier bill is relevant to the legislature's intent in enacting the later bill. The state begins by noting that, when Senator Ryles introduced HB 2955 (1983) to the House committee to which it had been assigned, she described that bill's central directive—that the age of waiver be lowered to 14 for violent crimes—as an "exception" to the

> "general philosophy that juveniles may be lacking in understanding and information and therefore may not be fully responsible for the crime they have committed and that they should not be typed by past misdeeds but should have the opportunity to grow and change."

Testimony, House Committee on Judiciary, Subcommittee 1, HB 2955, May 18, 1983, Ex A (statement of Senator Ryles). She explained that it was not realistic to say "that a 14- or 15 year-old is not sufficiently mature to understand the gravity of a violent crime which a 16-year-old is." She then added:

"We cannot persist in defining juveniles by an arbitrary age limit, ignoring the fact that maturation is a gradual process and that some 14 and 15-year olds may well understand the serious nature of the violent crimes they have committed."

*Id.* In the state's view, those and other comments by Senator Ryles establish that the 1983 bill sought to lower the age of waiver for violent crimes in a way that focused less on the youth's age and more on the youth's actual maturity. For instance, the state points to a number of comments by Senator Ryles that suggest that, in her view, most normally-abled 14- and 15-year-olds would pass the threshold test of sophistication and maturity provided in the bill. She explained that the "sufficient sophistication and maturity" criteria would "have the effect of eliminating any consideration of remand if, for example, *the juvenile was retarded, too immature to understand the nature of the act*, etc." Testimony, House Committee on Judiciary, HB 2955, June 6, 1983, Exhibit P (statement of Senator Ryles) (emphasis added). She later testified that the "sufficient sophistication and maturity" criteria was

"the first step one had to do. If you had a child that didn't know what they had done and couldn't understand what they had done one really didn't even need to move to any other criteria. *** I think it should be the number one criteria and the number one thing that we have in there because *in case there is a case of a mentally retarded child or someone that is extremely emotionally disturbed or something like that* that it's the criteria the court first looks at and then you begin to measure all these other things to see if remand is the appropriate policy."

Audio Recording, House Committee on Judiciary, HB 2955, June 6, 1983, Tape 408, Side A (comment of Senator Ryles) (emphasis added).

The problem with relying on most of those statements is that they were made in the context of the legislature's consideration of the 1983 bill, which was not enacted, and they were not repeated when the legislature took up the same wording in the 1985 bill.[19] During consideration of the

_____

[19] Senator Ryles did repeat, in her opening statements to committees considering the 1985 bill, her suggestion that the bill proposed an exception to

1985 bill, as we have observed, the bill's proponents spoke instead of the bill's focus on "more mature 14- and 15-year-olds" and juveniles of "advanced maturity." 359 Or at 590. And, even in 1983, Senator Ryles' more general statements support the idea that the bill was intended to permit waiver for those youths who were exceptions to the general rule that juveniles should be subject to adjudication in juvenile court. That some 14- and 15-year-olds may well understand the nature of their crimes in the required sense does not mean, as the state would have it, that most youths of that age will have that kind and level of understanding is required.

The state also observes that, during a legislative committee's consideration of the 1983 bill, the American Civil Liberties Union suggested amendments to the part of the bill that contained the "sufficient sophistication and maturity" requirement. Specifically, the ACLU suggested wording and placement of that requirement that was more in line with those of the *Kent* criteria: It would be removed from its place as a separate requirement and placed with other criteria to be considered when determining the "best interests" of the youth and the public, and it would look generally at "the sophistication and maturity of the child *as determined by consideration of the child's home environmental situation, emotional attitude and pattern of living.*" Testimony, House Judiciary Committee, Subcommittee 1, HB 2955, May 18, 1983, Ex E (statement of George Eder, ACLU). In response to the suggested amendment, Senator Ryles voiced her preference for the original wording and placement because, as a separate requirement, the provision would "have the effect of eliminating any consideration of remand if, for example the juvenile was retarded, too immature to understand the nature of the act, etc." Ex P, House Committee on Judiciary,

---

the general philosophy that juveniles lack understanding and therefore "may not be fully responsible" for their crimes, and her statement that some 14- and 15-year-olds "may well understand the serious nature of the violent crime they have committed." Testimony, Senate Judiciary Committee, SB 414 (1985), Apr 25, 1985, Ex B (statement of Senator Ryles); Testimony, House Judiciary Committee, Subcommittee 1, SB 414 (1985), May 30, 1985, Ex A-1 (statement of Senator Ryles). Those statements are rather general, however, and do not appear to undermine our general sense that the 1985 legislature continued to have a generally protective attitude toward juveniles and that it had more adult-like capacities in mind when it enacted the "sophistication and maturity" wording of ORS 419C.349(3).

HB 2955, June 6 1983 (memorandum to House Judiciary Committee from Senator Ryles). The committee rejected the suggested amendment, retaining the provision's position as a separate threshold requirement and its original, more limited wording: "sophistication and maturity to appreciate the nature and quality of the conduct involved." The state contends that that history shows that the legislature explicitly considered and rejected the idea of limiting waiver to those with an exceptional level of sophistication and maturity, and that it did not ascribe any specialized meaning to the phrase "sophistication and maturity."

Again, we do not agree with the state's assessment of the cited history. The offer and rejection of the ACLU amendment in 1983 shows only that the legislature wished to retain the "sophistication and maturity" wording as a separate threshold provision. Nothing about the fact of the rejection suggests any particular view of the level of sophistication and maturity that the original (retained) wording required. Moreover, the fact that the committee discussed the provision's origins in the *Kent* criteria and whether the bill should adhere to *Kent's* placement and wording confirms our understanding, expressed above, 359 Or at 584-85, that the legislators understood the provision as being strongly related to *Kent*'s "sophistication and maturity" criterion.

## V.  INTERPRETIVE SYNTHESIS

After considering the foregoing legislative history, we affirm our initial conclusion, based on the statute's text and context, that the requirement that ORS 419C.349(3) imposes is not equivalent to a requirement that a youth have criminal capacity. Rather, to authorize waiver of a youth who otherwise is eligible for waiver under ORS 419C.349 or ORS 419C.352, a juvenile court must find that the youth possesses sufficient adult-like intellectual, social and emotional capabilities to have an adult-like understanding of the significance of his or her conduct, including its wrongfulness and its consequences for the youth, the victim, and others.

Although the standard imposed by ORS 419C.349(3) is not as easily met as the state would have it, it also is not intended to be so difficult to meet that it precludes waiver

of youths whose adult-like capabilities make it appropriate for them to be tried in adult court. The legislature did not intend to impose a requirement that a youth have every one of the many capabilities of a typical adult. Rather, the legislature intended that a juvenile court take measure of a youth and reach an overall determination as to whether the youth's capacities are, on the whole, sufficiently adult-like to justify a conclusion that the youth was capable of appreciating, on an intellectual and emotional level, the significance and consequences of his conduct.

In making that determination, a juvenile court will be called on to consider its own knowledge and assessment of the capabilities of typical adults and the capabilities of the particular youth who is subject to wavier and any evidence on that subject that the parties may offer, such as the evidence that the juvenile court in this case considered. With regard to the capabilities of typical adults, a court could, for instance, consider its own understanding and evidence that the parties might offer indicating that adults have an ability to "measure and foresee consequences," Goldstein, *The Insanity Defense* at 50, and are significantly better than adolescents at accurately perceiving and weighing risks and benefits. Lita Furby and Ruth Beyth-Marom, *Risk Taking in Adolescence: A Decision-Making Perspective*, 12 Developmental Rev 1, 17 n 4, 9-11 (1992); Bonnie L. Halpern-Felsher & Elizabeth Cauffman, *Costs and Benefits of a Decision: Decision-Making Competence in Adolescents and Adults*, 22 J Applied Dev Psych 257 (2001); Barry C. Feld, *Adolescent Criminal Responsibility, Proportionality and Sentencing Policy: Roper Graham, Miller/Jackson and the Youth Discount*, 31 Law and Ineq 273, 284-90 (2013).

We cite those types of considerations and that type evidence not as fact, but as illustrative of considerations and evidence that, under our interpretation of ORS 419C.349(3), a juvenile court may find helpful in deciding what constitutes an adult-like capacity to "appreciate," or comprehend, with heightened understanding and judgment, an act's consequences and wrongfulness. After arriving at that understanding, the court must then determine whether the particular youth's capabilities are sufficiently similar to those of a typical adult that the court can conclude that the youth

has the requisite appreciation of the nature and quality of the conduct involved. That determination will again require the court to consider its own assessment of the particular youth's capabilities, including evidence, such as the court in this case considered, of the actions in which the youth engaged and the youth's history. A court may reach a conclusion about a youth's capabilities from inferences that the court draws from that evidence and from any expert testimony that the parties may offer. Such evidence will necessarily be multi-faceted; there is no one capability that a youth must have to demonstrate that the youth meets the requisite standard. Instead, a court may well have to compile and balance competing evidence relating to a youth's capabilities: As one researcher in the field has observed, "'[m]aturity' itself is not a unified concept; many youth—especially in later adolescence—may be relatively mature in some ways and not in others. They may be intellectually mature but socially immature; they may have mature decision-making capacities in terms of abilities to consider and weigh options, yet be morally immature in the ways in which they apply those abilities." Thomas Grosso, *Clinicians' Transfer Evaluations: How Well Can They Assist Judicial Discretion?* 71 La L Rev 157, 184 (2010). When it enacted ORS 419C.349(3), the legislature intended to have a trial court determine, from the evidence presented, whether the youth in question has sufficient adult-like mental, social and emotional capabilities to appreciate the relevant conduct, its consequences and criminality.

## VI.   APPLICATION

In this case, the juvenile court did not undertake that kind of analysis. The court's findings, boiled down to their essence, were that youth understood and acknowledged his own role in the murder and knew that it constituted a crime and would carry criminal consequences. Those findings demonstrate the youth's knowledge of his physical conduct and its physical consequences and criminality. They do not demonstrate or even relate to the question of whether the youth had the adult-like capacities that would allow him to appreciate the significance and wrongfulness of his conduct and its consequences in both an intellectual and an emotional sense. The juvenile court also relied on a finding

that youth possessed a degree of maturity that was consistent with his biological age (13) at the time of the murder (and that, in several unspecified respects, he possessed "a degree of maturity consistent with an older youth"). The court's reliance on the latter finding shows that the court did not understand that ORS 419C.349(3) looks for an overall adult-like rather than juvenile-like capacity to appreciate the nature and quality of the conduct emotionally as well as intellectually. In short, the juvenile court's findings do not support a conclusion that youth possessed "sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved," as we have interpreted that requirement. It follows that the case must be reversed and remanded to the juvenile court for further consideration under the proper standard.

The judgment of the juvenile court and the decision of the Court of Appeals are reversed, and the case is remanded to the juvenile court for further consideration.