JAMES, J.
*128 Under ORS 137.707(1), when a juvenile is charged with aggravated murder, that juvenile is automatically prosecuted as an adult, in adult criminal court, without regard to the qualities of youth that might be applicable to the accused. Once in adult criminal court, the youth is treated as any adult accused of aggravated murder would be treated. Aggravated murder, as defined in ORS 163.095, is the most serious crime in Oregon and the only permissible punishments for that crime, as provided in ORS 163.105, are, correspondingly, the harshest: death, life imprisonment without the possibility of release or parole, or life imprisonment. In this case, we are asked to determine the constitutionality, under the Eighth Amendment to the United States Constitution, of a sentence-specifically, life imprisonment-imposed on a juvenile offender pursuant to ORS 163.105, when such a sentence is imposed without regard to the individual characteristics of the juvenile defendant. Relying on the principles articulated by the United States Supreme Court in Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), Graham v. Florida , 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), and, Roper v. Simmons , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), we conclude that the imposition of life imprisonment, under ORS 163.105, on juvenile offenders without individualized considerations of youth by the sentencing court, is unconstitutional under the Eighth Amendment. Accordingly, we vacate the sentence imposed in this case and remand for further proceedings in accordance with this opinion.
I. BACKGROUND
This case has a long history. The underlying facts and much of the procedural history have been previously related in other opinions. As such, we repeat them only minimally here. When defendant was a teenager, he and four friends went on a crime spree that included stealing a car belonging to one friend's mother and then killing her to conceal the robbery.
Defendant was convicted, after a bench trial, on multiple felony counts. Counts 1 through 5 adjudicated defendant guilty of aggravated murder, ORS 163.095, on different *129 theories. Counts 1 through 3 alleged aggravated felony murder under ORS 163.095(2)(d). Counts 4 and 5 each alleged aggravated murder under ORS 163.095(2)(e), a murder "committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime."
In defendant's first appeal, State v. Link , 214 Or. App. 100, 110, 162 P.3d 1038 (2007) ( Link I ), we held, among other dispositions, *667 that the guilty adjudications on Counts 2 through 5 should have merged with the adjudication on Count 1, yielding a single conviction for aggravated murder.
The Oregon Supreme Court allowed review. In State v. Link , 346 Or. 187, 208 P.3d 936 (2009) ( Link II ), the Oregon Supreme Court concluded that we should have reached the merits of defendant's arguments concerning his convictions on Counts 1 through 3 because, in part, "whether a person is guilty as charged has an independent significance that cannot be foreclosed by later merger." Id. at 202, 208 P.3d 936. The court further concluded that defendant was entitled to an acquittal on those three counts, which were based on defendant having personally murdered the victim. As the court described:
"Here, the act of homicide was one act-the act of shooting-committed by one person-Koch. Even if, as the state argues, the defendant was the leader of the group, he remained outside the house and was not physically present when Koch committed that act. Defendant did not perform the shooting himself."
Id. at 211, 208 P.3d 936. The court's disposition read as follows:
"The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings."
Id. at 212, 208 P.3d 936. The court affirmed the remainder of our disposition, which had vacated and remanded for merger and resentencing on counts other than Counts 1 through 3.
On remand, the trial court refused to provide defendant with a new sentencing proceeding. Instead, the trial court entered an amended judgment reflecting that defendant was acquitted on Counts 1 through 3. The amended judgment stated that defendant was receiving a life sentence *130 on Count 4. It then merged Counts 5 through 10 (aggravated murder and conspiracy to commit aggravated murder) into Count 4 for sentencing purposes. The trial court did not change the sentences on the remaining offenses, except that it merged Counts 15 through 17 (robbery) into Count 4 for sentencing purposes. The amended judgment also merged Counts 19 through 20 into Count 18 (burglary) for sentencing purposes and the sentence on Count 18 was made concurrent with the sentence on Count 4.
In State v. Link , 260 Or. App. 211, 317 P.3d 298 (2013) ( Link III ), we "vacated and remanded for merger into a single conviction for aggravated murder" Counts 4 through 12; "vacated and remanded for merger into a single conviction for first-degree burglary" Counts 18 through 20; and "remanded for resentencing." Id. at 217, 317 P.3d 298. The trial court was "otherwise affirmed." Id.
The case currently before us arises from the remand to the sentencing court following our disposition in Link III . Before the sentencing court, defendant, by way of motion, challenged the imposition of a life sentence, arguing, in part, that "[t]he sentencing structure of ORS 163.105 - 163.150 for juveniles (at the time of the crime) convicted of aggravated murder violates Miller v. Alabama , the Eighth Amendment of the United States Constitution, and Article I, section 16, of the Oregon Constitution." The trial court denied the motion and imposed a sentence that included the following:[1]
"On Count 4, Aggravated Murder, ORS 163.095 :
"* * * * *
"Defendant shall serve a LIFE SENTENCE, pursuant to ORS 163.105(1)(c), the defendant shall be confined for a minimum of 30 years without possibility of parole, release to post-prison supervision, release on work release or any form of temporary leave or employment at a forest or work camp. The defendant is remanded to the physical custody of the Department of Corrections for service of this sentence."
(Capitalization in original.)
*131 Thus, this case comes before us again, still in the posture of direct appeal. On appeal, defendant partially renews his arguments before the sentencing court, but abandons *668 his reliance on Article I, section 16, and asserts:
"In this case, the trial court sentenced defendant, a juvenile, to a mandatory prison sentence of 30 years pursuant to ORS 163.105. Like the sentence that the United States Supreme Court found unconstitutional in Miller and the sentence that the Iowa Supreme court found unconstitutional in Lyle , the mandatory sentence imposed here, by its nature, 'preclude[s] a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it.' Miller , 567 U.S. at 476 [132 S.Ct. 2455]. Because ORS 163.105 does not allow the sentencing court to take into account the offender's age and other age-related characteristics and circumstances as required by Miller and indicated by Lyle , a mandatory prison term imposed on juveniles pursuant to ORS 163.105(1)(c) violates the cruel and unusual punishment clause of the Eighth Amendment."
In response, the state agrees that defendant preserved the arguments he advances on appeal but disputes the merits of those arguments. First, according to the state, Roper , Graham , and Miller can only be read to concern two specific sentences: death and life without parole. Alternatively, argues the state, even if Miller does apply to a life sentence imposed on a juvenile under ORS 163.105, the murder review hearing held 30 years after sentencing, pursuant to ORS 163.105(2), is a sufficient procedural opportunity to consider the Miller factors of youth, such as to render ORS 163.105 constitutional in its application to juvenile defendants. The arguments now framed, we turn to the merits.
A. Roper, Graham, and Miller
Eighth Amendment proportionality cases "fall within two general classifications." Graham , 560 U.S. at 59, 130 S.Ct. 2011. The first is a challenge to a term of years in light of all the circumstances of a particular case. Id . ; see Solem v. Helm , 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). The second involves categorical limits on certain sentencing practices. Graham , 560 U.S. at 60, 130 S.Ct. 2011. Here, defendant is raising that second variety, asserting that the Eighth Amendment prohibits *132 the imposition of a sentence under ORS 163.105 -as it is currently constructed-on a juvenile offender. We review the constitutionality of the imposition of a sentence for errors of law. State v. Cook , 108 Or. App. 576, 580, 816 P.2d 697 (1991), rev. den. , 312 Or. 588, 824 P.2d 417 (1992).[2] *669 In Roper , the United States Supreme Court recognized that "the unique characteristics of juveniles made that class of offenders ineligible for the death penalty." Kinkel v. Persson , 363 Or. 1, 14, 417 P.3d 401 (2018) (relying on Roper , 543 U.S. at 569, 125 S.Ct. 1183 ). Roper affirmed that "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable *133 among the young. These qualities often result in impetuous and ill-considered actions and decisions." 543 U.S. at 569, 125 S.Ct. 1183 (internal quotation marks omitted).
In addition, Roper noted that "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. * * * This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment." Id . (citation omitted). The Court noted as well that "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." Id . at 570, 125 S.Ct. 1183. Roper concluded that the qualities of youth
"render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. * * * From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."
Id. (internal quotation marks omitted).
Five years after Roper categorically prohibited the imposition of the death penalty on juveniles, the Court took up the issue of the constitutionality of juvenile life imprisonment for nonhomicide offenses in Graham . 560 U.S. at 52, 130 S.Ct. 2011. Although Graham arrived at a flat ban on life without parole for nonhomicide crimes, it did so after considering potential procedural solutions. Critically, Graham opined that "[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." Id. at 76, 130 S.Ct. 2011.
Finally, in Miller , the Court built upon Roper and Graham in considering the constitutionality of life without parole for juvenile homicide crimes. Miller , 567 U.S. at 465, 132 S.Ct. 2455. The Court noted that the reasoning of Roper and Graham was not confined to the particular sentences (death in Roper ) or crimes (nonhomicide in Graham ) involved in those cases.
*134 "[N]othing that Graham said about children is crime-specific. Thus, its reasoning implicates any life-without-parole sentence for a juvenile, even as its categorical bar relates only to nonhomicide offenses. Most fundamentally, Graham insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. The mandatory penalty schemes at issue here, however, prevent the sentencer from considering youth and from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender."
Miller , 567 U.S. at 465, 132 S.Ct. at 2458. Miller then distilled, in a precise and emphatic manner, what the "foundational principle" of those three cases was, holding that a state sentencing scheme cannot contravene " Graham 's (and also Roper 's) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children ." Id . at 474, 132 S.Ct. 2455 (emphasis added). The language in that holding is significant. Miller explicitly did not limit itself to death, or life without parole. It could have easily done so, and did not. Instead, Miller grounded its "foundational principle" within the broader category of "a State's most severe penalties." Id.
*670 Thus, Roper , Graham , and Miller work to ensure that sentences are proportionate under the Eighth Amendment by announcing both substantive and procedural limitations on the sentencing of juveniles. First, sentences of death are substantively prohibited as constitutionally disproportionate when applied to juveniles. Second, sentences of life imprisonment without parole are substantively prohibited as constitutionally disproportionate when applied to juveniles for nonhomicide offenses. Third, sentences of life imprisonment without parole for homicide offenses are substantively limited-being constitutionally disproportionate when imposed on almost all juveniles, but for "the rare juvenile offender whose crime reflects irreparable corruption." Graham , 560 U.S. at 73, 130 S.Ct. 2011 (internal quotation marks omitted). And, finally, any sentence that is among the "[s]tate's most severe" is procedurally limited. Such a "severe" sentence cannot be imposed on a juvenile "as though they were not children." Miller , 567 U.S. at 474, 132 S.Ct. 2455. That is, such a sentence cannot be imposed without the sentencer being afforded the ability *135 to consider youth. "An offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all [are] flawed." Graham , 560 U.S. at 76, 130 S.Ct. 2011. In other words, Eighth Amendment proportionality imposes a positive duty-a requirement upon the sentencer before imposing a severe sentence-to consider the lessened culpability of a juvenile offender and the lesser "likelihood that a juvenile offender forever will be a danger to society." Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 733, 193 L.Ed.2d 599 (2016) (internal quotation marks omitted). Only through the consideration of youth is a constitutionally proportionate sentence assured.
Our reading of Roper , Graham , and Miller is in keeping with other states. The Iowa Supreme Court held that
" Miller effectively crafted a new subset of categorically unconstitutional sentences: sentences in which the legislature has forbidden the sentencing court from considering important mitigating characteristics of an offender whose culpability is necessarily and categorically reduced as a matter of law, making the ultimate sentence categorically inappropriate. This new subset carries with it the advantage of simultaneously being more flexible and responsive to the demands of justice than outright prohibition of a particular penalty while also providing real and substantial protection for the offender's right to be sentenced accurately according to their culpability and prospects for rehabilitation."
State v. Lyle , 854 N.W.2d 378, 386 (Iowa 2014). Ultimately relying on Roper , Graham , and Miller , but applied through its state constitutional lens, the Iowa Supreme Court concluded "that the sentencing of juveniles according to statutorily required mandatory minimums does not adequately serve the legitimate penological objectives in light of the child's categorically diminished culpability." Id . at 398.
Similarly, the Washington Supreme Court looked to Roper , Graham , and Miller and concluded that
"[t]he Supreme Court's recent decisions explicitly hold that the Eighth Amendment to the United States Constitution compels us to recognize that children are different.
*136 "* * * * *
"The Supreme Court has already applied that holding about the differences between children and adults in several specific contexts: the death penalty, Roper , 543 U.S. at 574, 125 S.Ct. 1183 ; life without parole sentences for nonhomicide offenses, Graham , 560 U.S. at 79, 130 S.Ct. 2011 ; mandatory life without parole sentences for any offense, Miller , 132 S.Ct. at 2469 ; and confessions, J.D.B. v. North Carolina , 564 U.S. 261, 277, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011).
"Critically, the Supreme Court has also explained how the courts must address those differences in order to comply with the Eighth Amendment: with discretion to consider the mitigating qualities of youth."
State v. Houston-Sconiers , 188 Wash. 2d 1, 18-19, 391 P.3d 409, 418 (2017).
Ultimately, like Iowa, the Washington Supreme Court concluded:
*671 "In accordance with Miller , we hold that sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of any juvenile defendant, even in the adult criminal justice system, regardless of whether the juvenile is there following a decline hearing or not. To the extent our state statutes have been interpreted to bar such discretion with regard to juveniles, they are overruled. Trial courts must consider mitigating qualities of youth at sentencing and must have discretion to impose any sentence below the otherwise applicable SRA range and/or sentence enhancements."
Id . at 21, 391 P.3d at 420 (footnotes omitted).
In that vein, we conclude that the threshold question in considering whether the principles of Roper , Graham , and Miller apply at juvenile sentencing is this: Does the case involve the imposition of the state's most severe penalties against a juvenile defendant? When the sentence sought to be imposed on a juvenile is among the state's most severe, then procedurally, the imposition of that sentence cannot proceed as if the juvenile were not a child, even if the sentence otherwise might be substantively permissible. And, when the sentence is among the most severe, the secondary *137 question becomes whether the statutory sentencing scheme for a juvenile offender fulfills the constitutional duty to fully consider youth in sentencing. In this case, answering both those questions requires us to consider the statutes that govern the imposition of an aggravated murder sentence on a juvenile in Oregon.
B. Oregon's Aggravated Murder Statutory Scheme for Juveniles
As the Oregon Supreme Court previously explained, "[t]he murder statutes distinguish between 'ordinary' murder and murder that is accompanied by specified aggravating circumstances." State v. Ventris , 337 Or. 283, 292, 96 P.3d 815 (2004) (referencing ORS 163.115 (murder) and ORS 163.095 (aggravated murder)). Aggravated murder is defined in ORS 163.095 as murder "which is committed under, or accompanied by, any of the following circumstances. The statute goes on to list 17 separate aggravating circumstances." State v. Wille , 317 Or. 487, 493, 858 P.2d 128 (1993) (internal quotation marks omitted). Those 17 aggravating circumstances cover a very broad array of conduct.
Some aggravators are based on the status of the defendant. For example, ORS 163.095(1)(c) aggravates a homicide if "[t]he defendant committed murder after having been convicted previously in any jurisdiction of any homicide." Likewise, murder becomes aggravated murder if defendant was in a "correctional facility or was otherwise in custody when the murder occurred." ORS 163.095(2)(b). Other aggravators consider the method of the homicide. See, e.g ., ORS 163.095(2)(c) ("murder by means of an explosive"); ORS 163.095(1)(b) (solicitation). Still others aggravate a homicide based upon the motive. See, e.g. , ORS 163.095(2)(e) ("murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime"). Some aggravators require the defendant to have personally committed the murder ( ORS 163.095 (2)(d) ), but many do not. Finally, a murder may become aggravated murder based on some characteristic of the victim. ORS 163.095(2)(a)(A) - (H), for example, lists a variety of victim occupations including police officer, judicial officer, and "regulatory specialist." Also in this category is age. A *138 murder becomes aggravated murder if the victim is under 14 years of age. ORS 163.095(1)(f).
The only statutorily permissible sentences for a conviction of aggravated murder are set forth in ORS 163.105 : death, life without parole, or life imprisonment. That third potential sentence, life imprisonment, differs from "life imprisonment" imposed for a conviction of "ordinary" murder. See ORS 163.115. Specifically, a life sentence imposed under ORS 163.105 is eligible for conversion to life with the possibility of parole after 30 years. ORS 163.105(1)(c). In contrast, a life sentence for "ordinary" murder is eligible for conversion to life with the possibility of parole after 25 years. ORS 163.115(5)(b). Thus, the three sentences permissible under ORS 163.105 are unique to aggravated murder and *672 no other crime in Oregon can permit their imposition.
In addition to the substantive crime and associated sentence, two other statutes are implicated when a juvenile, as opposed to an adult, is charged with aggravated murder: waiver to adult court, ORS 419C.349, and the "second look" hearing, ORS 420A.203.
In 1959, the Oregon legislature adopted a Juvenile Code. See Brady v. Gladden , 232 Or. 165, 166, 374 P.2d 452 (1962). The Juvenile Code vested "exclusive original jurisdiction" in the juvenile court over "a person who is under 18 years of age" and "[w]ho has committed an act which if done by an adult would constitute a violation of a law or ordinance of the United States or a state." Id. at 166, 374 P.2d 452 (relying on former ORS 419.476 (1959), repealed by Or. Laws 1993, ch. 33, § 373 (internal quotation marks omitted)).
Although the 1959 Juvenile Code vested exclusive and original jurisdiction over any person under 18 years of age in juvenile court, there was a provision for waiver into adult criminal court. Former ORS 419.533(1) (1959), repealed by Or. Laws 1993, ch. 33, § 373, stated:
"A child may be remanded to a circuit, district, justice or municipal court of competent jurisdiction for disposition as an adult if:
"(a) The child is at the time of the remand 16 years of age or older; and *139 "(b) The child committed or is alleged to have committed a criminal offense or a violation of a municipal ordinance; and
"(c) The juvenile court determines that retaining jurisdiction will not serve the best interests of the child and the public."
State v. Little , 241 Or. 557, 560 n. 1, 407 P.2d 627 (1965) (citing former ORS 419.533(1) (1959) ).
A few years after Oregon enacted the Juvenile Code, the United States Supreme Court gave juvenile waiver hearings constitutional significance in Kent v. United States , 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). In Kent, the Court held that, when a state creates a juvenile jurisdiction court, to comply with the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the waiver procedure cannot be arbitrary:
"[T]he Juvenile Court should have considerable latitude within which to determine whether it should retain jurisdiction over a child or-subject to the statutory delimitation-should waive jurisdiction. But this latitude is not complete. At the outset, it assumes procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement of a full investigation.
"* * * * *
"* * * [Because the] decision as to waiver of jurisdiction and transfer of the matter to the District Court was potentially as important to petitioner as the difference between five years' confinement and a death sentence, we conclude that, as a condition to a valid waiver order, petitioner was entitled to a hearing, including access by his counsel to the social records and probation or similar reports which presumably are considered by the court, and to a statement of reasons for the Juvenile Court's decision."
Kent , 383 U.S. at 552-57, 86 S.Ct. 1045 (internal quotation marks and footnote omitted).
The Court noted that there should be articulated criteria for the juvenile court to consider in a waiver hearing, *140 citing with approval the 1959 District of Columbia Juvenile Court waiver criteria:
"1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.
"2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.
"3. Whether the alleged offense was against persons or property * * *.
"4. The prosecutive merit of the complaint * * *.
"5. The desirability of trial and disposition of the entire offense in one court * * *.
"6. The sophistication and maturity of the juvenile as determined by consideration *673 of his home, environmental situation, emotional attitude and pattern of living.
"7. The record and previous history of the juvenile * * *.
"8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile * * * by the use of procedures, services and facilities currently available to the Juvenile Court."
Id . at 566-67, 86 S.Ct. 1045.
Ten years after Kent , in State ex rel. Juv. Dept. v. Kent , 31 Or. App. 1219, 572 P.2d 1059 (1977), rev. den. , 282 Or. 1, --- P.3d ---- (1978),[3] we set out factors to be considered in the waiver hearing in Oregon. There, we held:
"In many of our past decisions, we have looked to the age of the juvenile remanded. The closer a juvenile is to the age of 18, the less reluctant we are to affirm a remand to the adult criminal court system. Generally, remands involving juveniles aged 17 have been upheld by this court. * * *
"Next, we have considered whether the child has had previous contact with the juvenile system and whether such contact has been helpful in rehabilitating the child. Where we find that a child has been involved with the juvenile system in the past and either has not been rehabilitated or is *141 presently manipulating the juvenile system to accomplish his own goals, we usually uphold a remand to the adult court. * * * Obviously, the fact that a child has been exposed to the rehabilitative efforts of the juvenile system with limited success militates against continuing to refer him to a system which is incapable of dealing with his problems.
"Third, we have examined the length of time that a child will be exposed to the juvenile system in order to determine whether the juvenile system can rehabilitate him before he is discharged at age 21. Where the evidence indicates that a child will need supervision beyond the age of 21 or the child will only be exposed to the juvenile system for a short period of time due to his proximity to age 21, we have upheld the propriety of a remand of the child to adult court. * * *
"Finally, we have looked to the number and severity of the acts of a criminal nature that the child has committed in the past. The greater the number and the more severe the past acts, the greater the likelihood that we will uphold a remand. * * * Where acts of violence (assaults and homicides) are committed by a juvenile, we have tended to examine the behavior in order to determine if it was done impulsively or reflects a general pattern of juvenile violence. An impulsive act may not require a remand, * * * while a planned assault generally will support a remand."
Id. at 1227-29, 572 P.2d 1059 (citations omitted).
Those criteria were codified by the Oregon legislature in 1985 and remain the same criteria set forth in the current Oregon waiver statute, ORS 419C.349. See State v. J. C. N.-V ., 359 Or. 559, 574-76, 380 P.3d 248 (2016) (describing history of 1985 Oregon legislature). Oregon's waiver statute includes a specific requirement that, before the court can entertain a decision on whether or not to transfer a juvenile to circuit court for prosecution as an adult, the court must find that "[t]he youth at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved." ORS 419C.349(3). In J. C. N.-V. , the Oregon Supreme Court interpreted that section to require the state to prove that the "youth possesses sufficient adult-like intellectual, social and emotional capabilities to have an adult-like understanding of the significance of his or her conduct, including its *142 wrongfulness and its consequences for the youth, the victim, and others." 359 Or. at 597, 380 P.3d 248.
Thus, as of 1985, under Oregon's juvenile waiver scheme, presumptive jurisdiction for all juveniles charged with a crime-including aggravated murder-originated in juvenile court. And, although the court could waive a juvenile to adult court, before doing so, it was required to consider the characteristics *674 of the defendant's youth. See J. C. N.-V. , 359 Or. at 598-99, 380 P.3d 248. That model changed, however, with the passage of Ballot Measure 11 (1994).
Measure 11 was passed by Oregon voters on November 8, 1994, and it went into effect on April 1, 1995. Measure 11 did two things: it mandated that anyone convicted of a designated offense be sentenced to the prescribed mandatory minimum sentence and it required that, "[n]otwithstanding any other provision of law, when a person charged with any of the offenses listed in subsection 2 of this section is 15, 16 or 17-years of age, at the time the charges are filed, that person shall be tried as an adult." Official Voters' Pamphlet, General Election, Nov. 8, 1994, 55.
During the 1995 session of the Oregon legislature, two bills were the vehicles for the implementation of Measure 11. First, House Bill (HB) 3439 (1995), which amended the murder statute guidelines. State v. Davilla , 234 Or. App. 637, 647, 230 P.3d 22 (2010) (discussing Oregon Laws 1995, chapter 421, section 3). Second, Senate Bill (SB) 1 (1995), which "undertook a comprehensive overhaul of the juvenile justice system." State v. Godines , 236 Or. App. 404, 418, 236 P.3d 824 (2010) (discussing Oregon Laws 1995, chapter 422, section 78). Section 1 of HB 3439 amended the original text of Measure 11 by removing the above-quoted text and replacing it with the text that was codified in ORS 137.707(1)(a) :
"Notwithstanding any other provision of law, when a person charged with aggravated murder, as defined in ORS 163.095, or an offense listed in subsection (4)(a) of this section is 15, 16 or 17 years of age at the time the offense is committed, and the offense is committed on or after April 1, 1995, * * * the person shall be prosecuted as an adult in criminal court."
See also Or. Laws 1995, ch. 2, § 1.
*143 The clear intent of Measure 11 was to remove the considerations of the characteristics of youth for juveniles accused of the most serious crimes and to limit the range of sentencing options to the same penalties that could be imposed on an adult offender. The plain text makes that clear and that is borne out by the history of the measure. The explanatory statement in the voters' pamphlet explicitly stated:
"This measure also requires that a person who is 15, 16 or 17 years of age when charged with one of the listed crimes must be tried and sentenced as an adult.
"Under current law, if a person who is under 18 years of age commits a crime, the juvenile court decides in each case whether the person will be tried and sentenced as an adult. The juvenile court currently looks at the person's age, the severity of the crime and other factors in making its decision."
Voters' Pamphlet at 56.[4] Thus, in the wake of Measure 11, the historical role of the waiver hearing as a procedural point, where the qualities of youth would be considered, was extinguished for some juveniles charged with the most serious crimes.
In addition to the procedural mechanism of discretionary waiver into adult court, Oregon statutes provide another point for the considerations of the characteristics of youth for juveniles sentenced to imprisonment-the second look hearing. ORS 420A.203. "The second look process provides an opportunity for selected persons who were under 18 years of age at the time of the commission of an offense to have a sentencing court determine whether they should serve their original sentences or be granted conditional *675 *144 release." State ex rel. Walraven v. Dept. of Corrections , 358 Or. 71, 73, 362 P.3d 1163 (2015). ORS 420A.203, in relevant part, provides:
"(1)(a) This section and ORS 420A.206 [conditional release] apply only to persons who were under 18 years of age at the time of the commission of the offense for which the persons were sentenced to a term of imprisonment, who committed the offense on or after June 30, 1995, and who were:
"(A) Sentenced to a term of imprisonment of at least 24 months following waiver under ORS 419C.349 [grounds for waiving youth to adult court], 419C.352 [grounds for waiving youth under 15 years of age], 419C.364 [waiver of future cases] or 419C.370 [waiver of motor vehicle, boating, game, violation and property cases]; or
"(B) Sentenced to a term of imprisonment of at least 24 months under ORS 137.707(5)(b)(A) or (7)(b) [adult prosecution of 15-, 16-, or 17-year-old offenders].
"(b) When a person described in paragraph (a) of this subsection has served one-half of the sentence imposed, the sentencing court shall determine what further commitment or disposition is appropriate as provided in this section. As used in this subsection and subsection (2) of this section, 'sentence imposed' means the total period of mandatory incarceration imposed for all convictions resulting from a single prosecution or criminal proceeding not including any reduction in the sentence under ORS 421.121 [reduction in term of incarceration] or any other statute."
With the passage of Measure 11, ORS 420A.203, like waiver into adult court, applies to some, but not all, juveniles convicted of aggravated murder. A juvenile who was 13 or 14 at the time of the crime commission, and then subsequently waived into adult court, is eligible for a second look hearing under ORS 420A.203(1)(a)(A). In contrast, a 15-, 16-, or 17-year old who commits aggravated murder is automatically waived into adult court and therefore is ineligible for a second look hearing under ORS 420A.203 (1)(a)(B).
From the foregoing discussion, it is apparent that the requirements for aggravated murder and the attendant consequences for juveniles vary considerably. Some *145 aggravators require the defendant to have personally committed the homicide, while others (such as in this case) do not. Similarly, a defendant can be guilty of aggravated murder as a principal or under an aid and abet theory. See, e.g. , ORS 161.155(2)(b) ("A person is criminally liable for the conduct of another person constituting a crime if * * * [w]ith the intent to promote or facilitate the commission of the crime the person * * * [a]ids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime.").
In turn, the procedural components of a juvenile prosecution vary. For example, a 14-year-old accused of murdering a 15-year-old would be charged with murder, not aggravated murder. Should that 14-year-old murder another 14-year-old, that defendant would be charged with aggravated murder, but that defendant would have the qualities of youth considered at the juvenile waiver hearing and, if convicted, again in 15 years have a second look hearing. In contrast, if a defendant is 15 when he commits the murder of a 14-year-old, the defendant would automatically be waived into adult court and, if convicted, would not have a second look hearing.
II. APPLICATION
Having discussed Roper , Graham , Miller , and the statutory schemes implicated when a juvenile is charged with aggravated murder in Oregon, we now turn to our application of those principles in this case. As a predicate matter, the state contends that any conclusion that Roper , Graham , and Miller apply to life sentences imposed under ORS 163.105 is foreclosed by our decision in State v. Conrad , 280 Or. App. 325, 335-36, 381 P.3d 880 (2016), rev. den. , 360 Or. 851, 389 P.3d 1141 (2017). The state misreads the scope of our opinion in that case.
In Conrad , the defendant challenged the imposition of a mandatory 75-month sentence for sexual abuse. We summarized the defendant's argument as follows:
"According to defendant, * * * 'the heart of the problem with such a sentence' is not *676 the length of the sentence, but the imposition of a mandatory sentence on a juvenile without accounting for the offender's age and other 'age-related *146 characteristics.' As such, defendant claims that the reasoning in Miller should be extended to essentially any statute that imposes a mandatory minimum sentence on a juvenile without allowing the sentencing court to consider the offender's status as a juvenile."
280 Or. App. at 336-37, 381 P.3d 880. In advancing that argument, the defendant diverged from the "foundational principle," as articulated in Miller , which ties the requirement for consideration of the qualities of youth to the imposition of the state's most severe sentences. Accordingly, we held:
"* * * Miller does not extend Eighth Amendment jurisprudence in such a way as to render ORS 137.707(2) facially unconstitutional. Simply put, ORS 137.707(2) does not mandate life imprisonment without parole for those under the age of 18 at the time of their crimes and we understand Miller 's reach to be limited to such a penalty."
Id. at 337, 381 P.3d 880 (footnote omitted).
In the present case, the state argues that, when we said that "we understand Miller 's reach to be limited to such a penalty" in Conrad , we held that Miller applied only to life without parole. See id. But that statement must be read in context with our following statement, where we explained:
"The Court emphasized that the statutory schemes at issue in Miller ran 'afoul of [the Court's] cases' requirement of individualized sentencing for defendants facing the most serious penalties. "
Id . at 337-38, 381 P.3d 880 (citing Miller , 567 U.S. at 465, 132 S.Ct. 2455 (emphasis in original)). Thus, our understanding of Miller , expressed in Conrad , was that Miller 's applicability was limited to "such a penalty"-namely, the most serious penalties. We continue to adhere to that understanding of Miller . The only penalty before us in Conrad was a 75-month sentence and that sentence did not rise to the level of "most serious." We had no occasion in that case to consider other sentences. This case, unlike Conrad , requires us to consider for the first time whether that particular form of life imprisonment imposed under ORS 163.105 is properly categorized as one of those most serious penalties and whether, when coupled with other statutory limitations, the constitutionally required full consideration of youth has been impermissibly withheld.
*147 Aggravated murder, as defined in ORS 163.095, is "the most serious offense in Oregon criminal law." Engweiler v. Persson/Dept. of Corrections , 354 Or. 549, 567, 316 P.3d 264 (2013) ; State v. Earp , 69 Or. App. 365, 371, 686 P.2d 437, rev. den. , 298 Or. 334, 691 P.2d 483 (1984) (noting that "aggravated murder is the most serious offense under the criminal code"). The three permissible sentences for aggravated murder are death, life imprisonment without parole, and life imprisonment. ORS 163.105. Each of those sentences have been called out by the United States Supreme Court as representing, in hierarchy, the most severe sentences available to a state. See, e.g. , Graham , 560 U.S. at 69, 130 S.Ct. 2011 (noting that "life without parole is the second most severe penalty permitted by law" (internal quotation marks omitted)); Roper , 543 U.S. at 568, 125 S.Ct. 1183 (noting that "the death penalty is the most severe punishment"); Harmelin v. Michigan , 501 U.S. 957, 996, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (holding that "life imprisonment with possibility of parole is also unique in that it is the third most severe" (emphasis in original)).
The term of imprisonment in this case-life with only the possibility of parole after 30 years-is exclusively imposed under ORS 163.105, and only for commission of aggravated murder, the most serious offense in the state. There is no other offense that can be committed in Oregon for which any of the sentences in ORS 163.105 can be imposed. And the possibility of parole is just that, a possibility . An individual sentenced under ORS 163.105 will almost certainly spend the majority of their adult life behind bars. And, it is entirely possible that an individual sentenced under ORS 163.105 will never return to society. Courts routinely consider such sentences to be among the most "severe" that society can impose. See, e.g. , *677 Ewing v. California , 538 U.S. 11, 40, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (Breyer, J., dissenting) ("[The defendant's] sentence [of 25 years to life] on its face imposes one of the most severe punishments available upon a recidivist who subsequently engaged in one of the less serious forms of criminal conduct."); United States v. Jackson , 583 Fed. Appx. 571, 572 (8th Cir. 2014) (concluding that a "life sentence is doubtless severe" in the context of life with parole eligibility); United States v. Little , 61 F.3d 450, 454 (6th Cir. 1995) (describing a life sentence with parole *148 eligibility as "severe"); Martin v. Kaiser , 907 F.2d 931, 936 (10th Cir. 1990) ("Nothing on its face except a death sentence can be more severe than a life sentence[.]"); Rummel v. Estelle , 568 F.2d 1193, 1196, vac'd on reh'g , 587 F.2d 651 (5th Cir. 1978), aff'd , 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (considering a life sentence with parole eligibility and noting that "[i]n most jurisdictions, a sentence to imprisonment for life now stands in the place where the death penalty stood earlier in this century the ultimate punishment imposed by this society for those crimes most abhorrent to it"); State v. Ruggles , 297 Kan. 675, 686, 304 P.3d 338, 345 (2013) ("[A] hard 25 life sentence, is a severe penalty * * *."); People v. McNally , 143 P.3d 1062, 1064 (Colo. Ct. App. 2005) (concluding that indeterminate life sentences with options for parole are more severe than lengthier fixed term sentences).
We need not decide the full contours of what constitutes the harshest or most severe criminal penalties in Oregon. It is sufficient, for purposes of this case, to say that the three sentences set forth in ORS 163.105 for aggravated murder-the most serious crime in Oregon-are, unsurprisingly, the "most severe" punishments available in the state and, as such, are in the category of penalties to which the principles set forth in Roper , Graham , and Miller apply.
Having answered the threshold question in the affirmative, we now must address whether the imposition of a sentence for aggravated murder under ORS 163.105 permits the considerations of the qualities of youth or proceeds "as though [juveniles] were not children." Miller , 567 U.S. at 474, 132 S.Ct. 2455. The state does not argue that the statute permits the consideration of the qualities of youth by the sentencing court. That concession is well taken. ORS 163.105 is a mandatory sentencing scheme applicable to adults and youth alike, regardless of age. As discussed previously, it was the clear intent of Measure 11 to eliminate any ability by a sentencer to differentiate between adults and a subcategory of juvenile offenders. That intent is reflected in the current statutory scheme, which imposes uniform adult sentences, eliminates discretionary waiver into adult court, and eliminates second look hearing eligibility for a subcategory of juveniles. As *149 such, there is no consideration by the sentencing court of the qualities of youth that might render the imposition of any of the three sentences prescribed by ORS 163.105 inapplicable. An adult offender and a youth offender are equally exposed to the same limited sentencing possibilities-life imprisonment without the possibility of parole and life imprisonment with a possibility that the sentence might be converted to consider parole after 30 years.
However, the state argues that there is a procedural mechanism for consideration of the qualities of youth-the murder review hearing. ORS 163.105(2) provides that a defendant sentenced to life imprisonment for aggravated murder may petition for a hearing, after a minimum period of confinement (30 years), to "determine if the prisoner is likely to be rehabilitated within a reasonable period of time." That hearing, argues the state, provides an opportunity for the consideration of the qualities of youth sufficient to comply with Miller . We disagree.
First, both Graham and Miller are replete with language holding that the proper actor to consider the qualities of youth is the sentencer . See, e.g. , Graham , 560 U.S. at 72, 130 S.Ct. 2011 ("To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible." (Emphasis added.)); Miller , 567 U.S. at 474, 132 S.Ct. 2455 ("But the mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations." (Emphasis added.)); see also *678 Miller , 567 U.S. at 477, 132 S.Ct. 2455 ("So Graham and Roper and our individualized sentencing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." (Emphasis added.)). The Supreme Court also made the point:
" Miller requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' "
Montgomery , --- U.S. ----, 136 S.Ct. at 733 (quoting Miller , 567 U.S. at 480, 132 S.Ct. 2455 (emphases added)).
*150 Second, even if the Board of Parole and Post-Prison Supervision (BOPPS) could be considered a sentencer for purposes of Miller , it is undisputed that any consideration of the qualities of youth would come-at a minimum-30 years after the imposition of the sentence. That delay would undercut the essence of Miller when it held that it was the act of subjecting the juvenile to the sentence without the consideration of the qualities of youth that was the constitutional violation. "By removing youth from the balance-by subjecting a juvenile to the same life-without-parole sentence applicable to an adult-these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." Miller , 567 U.S. at 474, 132 S.Ct. 2455. As the Court noted, the consideration of the qualities of youth is a prophylactic measure against the disproportionate deprivation of liberty. "At the least, a sentencer should look at such facts before depriving a 14-year-old of any prospect of release from prison." Miller , 567 U.S. at 478, 132 S.Ct. 2455 (emphasis added).
It would make little sense, and be questionably effective, to consider the unique qualities of youth when the defendant is well into middle age. As Miller noted:
"As we observed, youth is more than a chronological fact. It is a time of immaturity, irresponsibility, impetuousness[,] and recklessness. It is a moment and condition of life when a person may be most susceptible to influence and to psychological damage. And its signature qualities are all transient."
Miller , 567 U.S. at 476, 132 S.Ct. 2455 (citations and internal quotation marks omitted). Those transient qualities could hardly be said to be fully considered when they are but a distant memory-the child has grown.
Finally, even if a theoretical murder review hearing held 30 years after sentencing could suffice for the required consideration of the unique qualities of youth, a review of Oregon's statutes and administrative rules governing the conduct of a murder review hearing evidence that, as currently constructed, a murder review hearing in Oregon does not consider youth as something that diminishes the moral culpability and blameworthiness of the defendant.
*151 ORS 163.105(2) provides that, for purposes of conducting the murder review hearing, "[t]he sole issue is whether or not the prisoner is likely to be rehabilitated within a reasonable period of time." (Emphasis added.) The statute, by its plain terms, is future focused. It considers whether a person "is likely to be" rehabilitated at a future date, not whether the individual was less blameworthy due to their youth at the time of the offense. ORS 163.105(2).
In furtherance of that narrow focus, BOPPS has promulgated rules for conducting the review hearing. OAR 255-032-0020 provides:
"The sole issue of the hearing described in OAR 255-032-0015 shall be to determine whether or not the inmate is likely to be rehabilitated within a reasonable period of time. Criteria indicating whether the inmate is likely to be rehabilitated prior to release include:
"(1) The inmate's involvement in correctional treatment, medical care, educational, vocational or other training in the institution which will substantially enhance his/her capacity to lead a law-abiding life when released;
"(2) The inmate's institutional employment history;
"(3) The inmate's institutional disciplinary conduct;
"(4) The inmate's maturity, stability, demonstrated responsibility, and any apparent *679 development in the inmate personality which may promote or hinder conformity to law;
"(5) The inmate's past use of narcotics or other dangerous drugs, or past habitual and excessive use of alcoholic liquor;
"(6) The inmate's prior criminal history, including the nature and circumstances of previous offenses;
"(7) The inmate's conduct during any previous period of probation or parole;
"(8) The inmate does/does not have a mental or emotional disturbance, deficiency, condition or disorder pre-disposing them to the commission of a crime to a degree rendering them a danger to the health and safety of the community;
*152 "(9) The adequacy of the inmate's parole plan including community support from family, friends, treatment providers, and others in the community; type of residence, neighborhood or community in which the inmate plans to live;
"(10) There is a reasonable probability that the inmate will remain in the community without violating the law, and there is substantial likelihood that the inmate will conform to the conditions of parole."
Nowhere in that list of considerations is a defendant's youth at the time of the offense considered explicitly. Only OAR 255-032-0020(4) could be potentially read to encompass youth. That subsection provides for consideration of "[t]he inmate's maturity, stability, demonstrated responsibility, and any apparent development in the inmate personality which may promote or hinder conformity to law." OAR 255-032-0020(4). But even that provision is focused on the defendant's maturity now , at the time of the hearing, at least 30 years after sentencing. OAR 255-032-0020 ("Criteria indicating whether the inmate is likely to be rehabilitated prior to release[.]"). What the provision does not consider is im maturity at the time of the offense, nor how such immaturity lessened the culpability or blameworthiness of the defendant.
In contrast, California revised its statutory parole consideration factors in the wake of Miller to explicitly require the parole board to consider youth at the time of the offense as a mitigating factor. As some scholars have noted:
"California's comprehensive juvenile parole statute, which became operative in 2014, warrants careful examination; it has already begun to influence lawmakers in other states. In its preamble, the statute explicitly points to Miller in noting the developmental immaturity of youth, their reduced culpability, and enhanced prospects for becoming contributing members of society. It then announces the statutory purpose of providing offenders sentenced as juveniles with a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established. The statute provides expedited parole hearings for many juvenile offenders: prisoners serving determinate (not life) sentences of *153 any duration are eligible for parole consideration after a maximum of fifteen years of incarceration. Moreover, the legislature has sought to implement its commitment to providing a juvenile offender with a meaningful opportunity for reform by requiring that appropriate measures to promote rehabilitation be identified (and discussed with the prisoner) several years before she is eligible for parole consideration. At the youthful offender parole hearing, the panel is instructed by statute to give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner. A parole board directive also indicates that any psychological evaluations should take these factors into consideration, although it does not provide further instruction about how this should be done."
Elizabeth Scott, Thomas Grisso, Marsha Levick & Laurence Steinberg, Juvenile Sentencing Reform in a Constitutional Framework , 88 Temp. L. Rev. 675, 710-11 (2016) (internal quotation marks and footnotes omitted).
Similarly, Maryland revised its parole criteria post- Miller to explicitly account for youth at the time of the offense and the *680 lessened moral culpability that therefore attaches to the commission of the crime:
"If the inmate was a juvenile at the time of the offense, the Parole Commission's regulations require consideration of the following additional factors:
"(a) age at the time the crime was committed;
"(b) the individual's level of maturity and sense of responsibility at the time of [sic ] the crime was committed;
"(c) whether influence or pressure from other individuals contributed to the commission of the crime;
"(d) whether the prisoner's character developed since the time of the crime in a manner that indicates the prisoner will comply with the conditions of release;
"(e) the home environment and family relationships at the time the crime was committed;
"(f) the individual's educational background and achievement at the time the crime was committed; and *154 "(g) other factors or circumstances unique to prisoners who committed crimes at the time the individual was a juvenile that the Commissioner determines to be relevant."
Carter v. State , 461 Md. 295, 321, 192 A.3d 695, 710 (2018) (citing COMAR 12.08.01.18A(3) (considerations for parole "adopted in view of recent Supreme Court decisions concerning parole of juvenile offenders")).
However, no equivalent changes to the murder review hearing statute, nor the BOPPS rules governing those hearings, have been enacted in Oregon in light of Miller . Additionally, even if OAR 255-032-0020(4) could be read to permit litigation of a defendant's decreased moral responsibility due to youth, our cases show that attempts before the parole board to lessen one's moral responsibility can be viewed negatively. See, e.g. , Wille v. Board of Parole , 287 Or. App. 709, 714, 404 P.3d 1042 (2017), rev. den. , 362 Or. 795, 423 P.3d 714 (2018) (upholding the board's denial of a murder review petition because "[t]he board could also reasonably find that petitioner had failed to accept responsibility for the full range of his criminal behavior" (internal quotation marks omitted)); Mendacino v. Board of Parole , 287 Or. App. 822, 828, 404 P.3d 1048 (2017), rev. den. , 362 Or. 508, 424 P.3d 724 (2018) (affirming denial of parole, in part, because board reasoning "indicated that petitioner had not accepted responsibility for [his] crime, and therefore [has] not gained the self-knowledge that would operate to prevent [him] from killing again" (internal quotation marks omitted)).
Relying in part on Montgomery , the dissent concludes that "the imposition of a life sentence with the possibility of parole cures a Miller violation," 297 Or. App. at 167, 441 P.3d at 687 (Tookey, J., dissenting), and that Oregon's murder review hearing renders the sentence constitutional because it "give[s] a juvenile offender a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," id. 297 Or. at 177, 441 P.3d at 692 (Tookey, J., dissenting). Neither party on appeal cited to or relied upon Montgomery . Nevertheless, we do not read Montgomery to cabin Miller 's holding to the extent the dissent would advocate. Context explains Montgomery . There, the petitioner was 17 years old in 1963 when he killed a deputy sheriff in Louisiana. He had been *155 incarcerated for nearly 50 years when the Court made clear in Miller "that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." 567 U.S. at 473, 132 S.Ct. 2455 (emphasis added). The question for Montgomery was if, and how, a 50-year-old sentence could "proceed."
Montgomery reiterated that the normal procedure was to permit the sentencer to consider youth. "Although Miller did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children." Montgomery , --- U.S. ----, 136 S.Ct. at 726 (relying on Miller , 567 U.S. at 479-80, 132 S.Ct. 2455 (emphasis added)). Thus, "[ Miller ] mandates * * * that a sentencer follow a certain process-considering an offender's youth and attendant characteristics."
*681 Montgomery , --- U.S. ----, 136 S.Ct. at 734 (relying on Miller , 567 U.S. at 479, 132 S.Ct. 2455 ("a sentencer needed to examine all these circumstances before concluding") (emphasis added)).
The Court considered the retroactive applicability of its holding in Miller , concluding that " Miller announced a substantive rule that is retroactive in cases on collateral review." Montgomery , --- U.S. ----, 136 S.Ct. at 732. In that context-collateral review-the Court opined:
"Giving Miller retroactive effect, moreover, does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole. A State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them.
"* * * * *
"Extending parole eligibility to juvenile offenders does not impose an onerous burden on the States, nor does it disturb the finality of state convictions."
Montgomery , --- U.S. ----, 136 S.Ct. at 736.
In stark contrast to Montgomery , this case comes before us on direct appeal, not collateral review. Montgomery does not control on the issue of whether, for a case coming from the sentencing court on direct appeal, a murder review *156 hearing under ORS 163.105(2) meets the requirements of Miller for the consideration of the qualities of youth. The central requirement of Miller remains: The imposition of the most severe penalties on juvenile offenders cannot proceed as though they were not children. See Miller , 567 U.S. at 473, 132 S.Ct. 2455. In this case, because of its procedural posture, we have available the natural remedy unavailable in Montgomery -that is, a remand on the direct appeal for a new sentencing hearing. How a case proceeds on direct appellate review from an unconstitutional sentencing is to remand for a new sentencing hearing.[5]
In light of the limitations of Oregon's murder review hearing, as imposed by statute and rule, we cannot conclude that such a hearing provides for the meaningful consideration of the unique qualities of youth that might make the "irresponsible" conduct of a juvenile offender "not as morally reprehensible as that of an adult." See Roper , 543 U.S. at 570, 125 S.Ct. 1183 (internal quotation marks omitted). A murder review hearing after 30 years comes too late; it is not the same as the imposition of a sentence made proportionate by recognition of lessened culpability at the time of the sentencing and it does not consider the same set of questions.
We emphasize that neither Miller , the Eighth Amendment, nor our opinion in this case, categorically prohibits the state from imposing a life sentence on a juvenile in all cases. The problem lies not with the potential substance of the sentence, but with the procedural imposition of the sentence. As Miller noted, "[a]lthough we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, *157 and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 567 U.S. at 480, 132 S.Ct. 2455.
The deficiency in Oregon's juvenile aggravated murder statutory scheme lies in its mandatory applicability to some juvenile defendants. The substantive statute encompasses a broad array of conduct, including personally and nonpersonally committed homicides. The statutory scheme then removes the opportunity for the consideration of the qualities of youth at a waiver hearing from some juveniles, but not all, while also removing a second look consideration of the *682 qualities of youth from some juveniles, but not all. By that scheme, it creates a subcategory of juvenile defendants for whom no sentencer will ever meaningfully consider the transient qualities of youth. As to those juveniles, it may be constitutional for a sentencer to reasonably conclude that a particular defendant warrants a lengthy sentence and to choose that sentence from among a range of options. But, a sentencing scheme that dictates such a severe sentence be applied to a juvenile defendant, without regard for the qualities of youth, runs afoul of Miller .
In so holding, Miller is in keeping with other areas of the law where a child's age must be considered. The United States Supreme Court has recognized a child's age as relevant to the analysis of whether the child is in custody for the purposes of Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). See J. D. B. v. North Carolina , 564 U.S. 261, 275-77, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). There, the Court held that youth "is a fact that generates commonsense conclusions about behavior and perception" that "apply broadly to children as a class" and "are self-evident to anyone who was a child once." J. D. B. , 564 U.S. at 272, 131 S.Ct. 2394 (internal quotation marks omitted). The Court also noted that "events that 'would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens.' " Id . (quoting Haley v. Ohio , 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948) ). The simple reality is that, because children are categorically different under the law, a child's age is "a reality that courts cannot simply ignore." Id. at 277, 131 S.Ct. 2394.
In sum, for sentencing purposes, a court cannot impose the state's most severe penalties on a juvenile offender *158 without regard for the unique qualities of youth that might make imposition of that sentence inappropriate. In this case, the court imposed a mandatory sentence of life in prison under ORS 163.105 -one of the state's most severe sentences-on a defendant who did not have the benefit of a waiver hearing into adult court, nor is afforded a second look hearing. Consequently, the court did not consider defendant's youth in imposing that sentence. Finally, the possibility of a murder review hearing by the parole board 30 years in the future is not a constitutionally adequate substitute for that consideration. Taken together, the several statutes that comprise the Oregon scheme for imposition of the severe sentence options for aggravated murder on a juvenile defendant fail the procedural obligation-the affirmative duty-to assess the role of youth at the time of sentencing in determining the constitutionally proportionate sentence. As such, we conclude that the application of ORS 163.105 as written, to a juvenile defendant, violates the Eighth Amendment.
Sentence on Count 4 vacated; remanded for resentencing, otherwise affirmed.

Sentence recited in relevant part.

For purposes of analyzing whether a sentencing scheme is categorically cruel and unusual, "Article I, section 16, closely parallels the Eighth Amendment." Billings v. Gates , 323 Or. 167, 173, 916 P.2d 291 (1996). In Billings , the Oregon Supreme Court held that "[w]e find nothing in the history of the 'cruel and unusual punishments' clause of Article I, section 16, that suggests that it affords more protection in this context than does the Eighth Amendment." 323 Or. at 178, 916 P.2d 291.
It is worth noting, however, that the line of cases on which defendant relies may not be best categorized as "cruel and unusual" jurisprudence, but rather reflect the "narrow proportionality principle" contained in the Eighth Amendment. Harmelin v. Michigan , 501 U.S. 957, 997-98, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in judgment). Proportionality does not appear in the plain text of the Eighth Amendment. That somewhat nascent principle is traced to Weems v. United States , 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910), which held that embodied in the cruel and unusual clause is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." Even its proponents acknowledge that "its precise contours are unclear. This is so in part because we have applied the rule in few cases." Harmelin , 501 U.S. at 998, 111 S.Ct. 2680 (Kennedy, J., concurring). It is a principle that has drawn, and continues to draw, opposition from members of the Court. See, e.g. , Graham , 560 U.S. at 99, 130 S.Ct. 2011 (Thomas, J., dissenting, joined by Scalia, J. and Alito, J.) ("More recently, however, the Court has held that the Clause authorizes it to proscribe not only methods of punishment that qualify as 'cruel and unusual,' but also any punishment that the Court deems 'grossly disproportionate' to the crime committed. * * * This latter interpretation is entirely the Court's creation. As has been described elsewhere at length, there is virtually no indication that the Cruel and Unusual Punishments Clause originally was understood to require proportionality in sentencing.").
In contrast to the Eighth Amendment, Article I, section 16, which states that "[c]ruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense," does provide an explicit textual mandate for proportionate sentencing. Unsurprisingly, Oregon's jurisprudence in this area is robust. See, e.g. , State v. Carey-Martin , 293 Or. App. 611, 646, 430 P.3d 98 (2018) (James, J., concurring) (relating landscape of Article I, section 16, decisions).
However, before this court, defendant has abandoned his reliance on Article I, section 16, and asserted solely an Eighth Amendment argument. Thus, we decide this case only on those federal grounds.

The Oregon case is not related to the United States Supreme Court's decision in Kent .

Our traditional statutory interpretive framework looks to text, context, and legislative history. See State v. Gaines , 346 Or. 160, 206 P.3d 1042 (2009) ; PGE v. Bureau of Labor and Industries , 317 Or. 606, 859 P.2d 1143 (1993). For an initiative, the task is the same-a search for the intent of the voters. Hazell v. Brown , 352 Or. 455, 465, 287 P.3d 1079 (2012) ("[W]e apply a similar method of analysis to statutes enacted by voter-initiated measures as we do to statutes enacted by the legislature, with the goal of discerning the intent of the voters who passed those initiatives into law."); State v. Guzek , 322 Or. 245, 265, 906 P.2d 272 (1995). As well as the text of the measure, "we look to the voters' pamphlet and other information that was available to the public at the time of the vote." State v. Sagdal , 258 Or. App. 890, 897, 311 P.3d 941 (2013), aff'd , 356 Or. 639, 343 P.3d 226 (2015).

Additionally, it is worth noting how Oregon's murder review system impacts the analysis. ORS 163.105(2) does not provide for automatic parole eligibility. Rather, a murder review hearing is held only when a petitioner affirmatively files a petition, and only then, if BOPPS unanimously concludes that the petitioner has met his burden, does the sentence become converted to one eligible for parole. ORS 163.105(3), (4). Parole is not granted at that stage. Instead, a wholly separate exit interview procedure comes into play, where parole may be denied. See ORS 144.285. And if release is denied, a rehearing may be deferred for up to 10 years. Even if Montgomery were controlling here, which it is not, Oregon's murder review hearing is not "extending parole eligibility" in the manner contemplated by Montgomery , --- U.S. ----, 136 S.Ct. at 736. Rather, it extends the chance to obtain parole eligibility.